# WESTERN DERMATOLOGY CONSULTANTS, P.C. *v.* VITALWORKS, INC., ET AL.
## (AC 32051)
## (AC 32052)
## (AC 34121)

Robinson, Sheldon and Flynn, Js.

Argued February 7—officially released October 1, 2013

*Kimberly A. Knox,* with whom were *Wesley W. Horton* and, on the brief, *Dana M. Hrelic, Kenneth J. Bartschi* and *Edward T. Krumeich,* for the appellant-appellee (named defendant).

*Steven R. Smart*, for the appellant-appellee (defendant Cerner Physician Associates, Inc.).

*Phyllis S. Lynn*, pro hac vice, with whom were *Bradford S. Babbitt* and, on the brief, *Michael S. Jahner*, pro hac vice, and *Jeffrey J. White*, for the appellee-appellant (plaintiff).

*Opinion*

FLYNN, J. The defendants, VitalWorks, Inc. (VitalWorks), and Cerner Physician Associates, Inc. (Cerner), appeal from the judgments of the trial court awarding damages, costs and attorney's fees to the plaintiff, Western Dermatology Consultants, P.C. The plaintiff appeals from the court's refusal to award punitive damages, prejudgment interest and certain costs, as well as from the court's refusal to award all of the attorney's fees to which it claimed entitlement. All appeals were consolidated for argument before this court. We reverse the judgment of the trial court, and dismiss the plaintiff's appeal.

The following facts, as found by the court or undisputed by the parties, and procedural history are relevant to this appeal. The plaintiff corporation operates a dermatological practice in Albuquerque, New Mexico. The practice was founded in 1997. The defendant, VitalWorks, a Delaware corporation, had its corporate headquarters in Ridgefield, Connecticut, and was engaged in the sale of computer software that was based on a Windows operating system. VitalWorks demonstrated its software at a San Francisco medical conference of the American Academy of Dermatology in March, 2003, where Dr. Leslie Glass, a principal of the plaintiff, first saw it demonstrated. VitalWorks demonstrated its software at one of the plaintiff's offices in September, 2003.

Ultimately, on December 19, 2003, the plaintiff signed a contract in New Mexico with VitalWorks to purchase

Intuition Practice Management and Electronic Medical Records software (software), as well as concomitant hardware and services, including training, for the plaintiff's practice. The actual software and hardware was located in New Mexico at the plaintiff's offices. VitalWorks' software operation was located in Alabama.

In January, 2005, Cerner purchased certain assets of VitalWorks. Cerner is a Delaware corporation with its principal place of business in Kansas City, Missouri. Cerner also had an office in Birmingham, Alabama. Cerner took over VitalWorks' Alabama location.

VitalWorks installed version 5.1 of the software on the plaintiff's server. VitalWorks also configured the server at its office and installed additional hardware at the plaintiff's location. The plaintiff's staff encountered numerous issues with the software and its installation, the hardware and its installation, and the concomitant training for both. The plaintiff's staff felt that they never were able to get the software to work as represented to them prior to entering into the contract with VitalWorks.

The plaintiff commenced the present action against VitalWorks and Cerner and filed a second amended complaint dated April 26, 2007, alleging six counts: (1) breach of contract, (2) breach of warranty, (3) fraud in the inducement, (4) negligent misrepresentation, (5) unjust enrichment, and (6) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Following a bench trial, the court, in a memorandum of decision dated September 1, 2009, found in favor of the plaintiff on its breach of contract, breach of warranty, negligent misrepresentation and CUTPA counts. The court awarded $863,240.82 in damages for the breach of warranty, negligent misrepresentation, and CUTPA counts. The court did not find for the plaintiff on its fraud and unjust enrichment counts.

The court's original damage award was broken down as follows: breach of warranty $83,399.82, negligent misrepresentation $5100, and CUTPA $774,741. The court found that Cerner was liable on the CUTPA count. Thereafter, VitalWorks and Cerner filed their respective motions to reargue.

The plaintiff moved for costs, attorney's fees, and prejudgment interest on November 23, 2009, and for punitive damages on November 18, 2009. On February 23, 2010,[1] the court issued its memorandum of decision regarding the defendants' motions to reargue. The court reduced the CUTPA award by $617,299.42 to $157,441.58. After a hearing, the court denied the plaintiff's request for punitive damages, attorney's fees, and prejudgment interest. The court taxed costs in favor of the plaintiff in the amount of $2340.16. The plaintiff moved to reargue that ruling on April 30, 2010. By memorandum of decision filed November 28, 2011, the court let its rulings on punitive damages and prejudgment interest stand, but awarded the plaintiff $496,051.95 in attorney's fees and an additional $45,000 in costs for the plaintiff's expert witness, Dr. Steven Kursh. To sum up the effect of these series of judgments, the court awarded no damages on the breach of contract count, despite finding for the plaintiff. The court awarded the plaintiff breach of warranty damages of $83,399.82, negligent misrepresentation damages of $5100, and CUTPA damages of $157,441.58, for a total of $245,941.40.[2] The

[1] A corrected memorandum of decision was issued by the court on February 24, 2010.

[2] The court listed the following damages in its memorandum of decision dated February 23, 2010, addressing the defendants' motions to reargue:

| "Count II | $ 83,399.82 |
| "Count IV | $  5,100.00 |
| "Count VI | |
|    "Training | $117,441.58 |
|    "Lost Earnings | $ 40,000.00 |
| "Total | $235,941.40" |

There is a $10,000 error in the court's computation. The true mathematical total of damages awarded is $245,941.40.

court also awarded the plaintiff $496,051.95 in attorney's fees and $47,340.16 in costs. These appeals then followed.

On appeal, VitalWorks claims that the court erred in concluding that the commercial contract provisions governing warranty, the limitation of warranties, and remedies were unenforceable and that various statements preceding the execution of the contract made by salespersons created an express warranty between the plaintiff and VitalWorks. VitalWorks also claims that the court erred in finding misrepresentation and concluding that Connecticut law applies, namely, CUTPA. VitalWorks further claims that there was error in the court's award of $45,000 in expert witness costs and excluding evidence from two defense witnesses regarding their opinions based upon their review of a backup copy of the software, that the software was functional and most problems encountered were due to the plaintiff's user error.

On appeal, Cerner claims that the court erred by imposing successor liability on it where no party made such an argument before, during, or after trial, the plaintiff failed to plead or prove that Cerner was liable under successor liability principles, and there was insufficient evidence before the court regarding the continuity of enterprise exception to establish successor liability. Cerner also claims that the court erred in concluding that Cerner engaged in trade or commerce in Connecticut within the meaning of CUTPA. Additionally, Cerner claims that the court erred in finding it liable for violating CUTPA where Cerner had no contractual relationship with the plaintiff and the plaintiff failed to establish the nexus between Cerner and Connecticut. Cerner further claims that the court erred by awarding damages to the plaintiff because the plaintiff failed to prove the damages within a reasonable degree of certainty and that the damages were caused by Cerner. Cerner's final

claim on appeal is that the court erred in awarding the plaintiff attorney's fees and in its allocation of these fees between Cerner and VitalWorks.

The plaintiff also filed a separate, but related appeal on December 16, 2011. On appeal the plaintiff claims that the court abused its discretion in denying the plaintiff punitive damages, reducing the amount of attorney's fees and refusing to award it certain costs. The plaintiff also claims that the court erred in declining to award it prejudgment interest.

As a preliminary matter we must first address whether the Uniform Commercial Code (UCC), General Statutes §§ 42a-2-101 et seq., applies to the transaction encapsulated in the contract. General Statutes § 42a-2-102 states in relevant part that the UCC "applies to transactions in goods . . . ." "Goods" are defined in General Statutes § 42a-2-105 (1) as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale . . . ." The contract at the center of this dispute is for the purchase of software licenses, hardware, services and concomitant support. In many states, including Connecticut, it is not clear whether the purchase of a software license is a sale of goods and, thus, within the purview of the UCC. See *Arbitron, Inc.* v. *Tralyn Broadcasting, Inc.*, 400 F.3d 130, 138 n.2 (2d Cir. 2005); *Specht* v. *Netscape Communications Corp.*, 306 F.3d 17, 29 n.13 (2d Cir. 2002). There is persuasive jurisprudence that suggests that it does.

Section 42a-2-102 applies the article to "transactions." "Clearly a 'transaction' encompasses a far wider area of activity than a 'sale,' and it cannot be assumed that the word was carelessly chosen. The 1955 Report of the Law Revision Commission, at page 363, reveals that the 'property' or 'title' concept is of negligible importance under article [two]; and indeed a reading

of the article leads to the conclusion that this was the intent. The [c]ode considers the duties, rights and remedies arising from a transaction as of primary importance, and relegates the concept of 'title' to a far lesser status than it had under earlier common law . . . . [T]he scope of the article was not limited to a transaction involving solely a 'sale' with 'title' and 'property' . . . ." *Hertz Commercial Leasing Corp.* v. *Transportation Credit Clearing House*, 59 Misc. 2d 226, 230, 298 N.Y.S.2d 392 (1969), rev'd on other grounds, 64 Misc. 2d 910, 316 N.Y.S.2d 585 (1970); see also *Wells* v. *10-X Mfg. Co.*, 609 F.2d 248, 254 n.3 (6th Cir. 1979) ("The use of the term transaction rather than sale in U.C.C. § 2-102 is significant in that it makes clear that the reach of [a]rticle [two] goes beyond those transactions where there is a transfer of title. Thus, [a]rticle [two] sections have been applied in decisions involving transactions that are not sales, but which are used as substitutes for a sale or which have attributes analogous to a sale . . . ."). In *Hertz Commercial Leasing Corp.*, the New York trial court recognized that leases of equipment had become substitutes for purchases. *Hertz Commercial Leasing Corp.* v. *Transportation Credit Clearing House*, supra, 228. Licenses, like leases, have become substitutes for outright purchases in the software industry.

Furthermore, "[t]he term goods is not to be given a narrow construction but instead should be viewed as being broad in scope so as to carry out the underlying purpose of the [c]ode of achieving uniformity in commercial transactions." (Internal quotation marks omitted.) *NIM Plastics Corp.* v. *Standex International Corp.*, 11 F. Supp. 2d 1003, 1005 n.3 (N.D. Ill. 1998). In *Triangle Underwriters, Inc.* v. *Honeywell, Inc.*, 604 F.2d 737 (2d Cir. 1979), the United States Court of Appeals for the Second Circuit applied the UCC and its four year statute of limitations to a contract for the

purchase and installation of computer hardware and software. Triangle Underwriters, Inc., entered into a contract with Honeywell, Inc., for " 'hardware,' or the core computer, printer, collator, and related equipment; and 'software,' the designation for programming created for use in connection with the hardware." Id., 739. The agreement in the present case is quite similar. The court found that "VitalWorks installed [software] version 5.1 on [the plaintiff's] server. VitalWorks was to configure the server at its office and install the remainder of the hardware on-site." The software was purchased for use in connection with the hardware that was also purchased under the agreement. Although this issue has not been squarely before our Supreme Court, that court has previously reviewed a software licensing agreement under the UCC.[3] See *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 589 A.2d 337 (1991). Thus, with respect to the software licensing, we conclude that it should be treated as a transaction in goods.

In addition to the software licenses, the contract between VitalWorks and the plaintiff was for the purchase of hardware, which constitutes "goods," as well as support services. The contract is a hybrid agreement for the sale of goods and services. "To determine whether a contract including both goods and services is governed by the [UCC], the court must determine 'whether the dominant factor or "essence" of the transaction is the sale of the materials or the services.' " *Nora Beverages, Inc.* v. *Perrier Group of America, Inc.*, 164 F.3d 736, 747 (2d Cir. 1998). The support services

---

[3] In *Latham & Associates, Inc.*, the plaintiff did not appeal the "court's conclusion of law that article [two] of the [UCC] . . . governs the transactions between the parties, even though the mortgage [computer] system contemplated a [software] licensing arrangement rather than outright sale." (Citation omitted.) *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991). Our Supreme Court, therefore, reviewed that case assuming the applicability of the UCC.

to be provided by VitalWorks via the agreement were all related to and dependent upon the software and hardware purchased under the agreement. Without the software and hardware, i.e., the goods, there would have been no need for the concomitant support. The essence of this agreement, therefore, was a "transaction in goods" under § 42a-2-102 and, as such, the UCC governs this agreement.

I

On appeal, VitalWorks first claims that the court erroneously concluded that the commercial contract provisions governing warranty, the limitation of warranties and remedies were unenforceable and that various statements preceding the execution of the contract made by salespersons created an express warranty between the plaintiff and VitalWorks. Within VitalWorks' discussion of this first issue, however, it collaterally challenges the court's finding that the contract had been breached and, as such, we will first address this challenge.

A

The following additional facts are relevant to whether the court erred in finding that VitalWorks breached the contract. The court found that "[b]y contract dated December 19, 2003, [the] plaintiff purchased the VitalWorks . . . software marketed and sold by VitalWorks as an integrated system designed to enable it to schedule appointments, maintain patient files, bill patients and insurance reimbursement and create electronic medical records." VitalWorks was found to have agreed to supply software licenses, hardware, installation, training, and customer support. The court concluded that "VitalWorks was in breach of all of the above contractual obligations."

We begin by setting forth our standard of review and the principles that guide our analysis. "The determination of whether a contract has been materially breached is a question of fact that is subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Efthimiou* v. *Smith*, 268 Conn. 487, 493–94, 846 A.2d 216 (2004). Although a finding of breach of contract is subject to the clearly erroneous standard of review, whether the court chose the correct legal standard to initially analyze the alleged breach is a question of law subject to plenary review. *Saunders* v. *Firtel*, 293 Conn. 515, 538 n.3, 978 A.2d 487 (2009) (*Rogers, C. J.*, concurring and dissenting). "Whether the court properly applied the relevant provisions of [General Statutes] § 42a-1-101 et seq. involves statutory interpretation, which is a question of law." (Internal quotation marks omitted.) *Kalas* v. *Cook*, 70 Conn. App. 477, 482, 800 A.2d 553 (2002). We conclude that the applicable standard for the present claim is plenary.

The trial court, in its memorandum of decision dated September 1, 2009, stated that "contracts for the development and sale of computer systems are governed by the [UCC] . . . ." The trial court repeated this statement in its memorandum of decision dated May 18, 2012, in response to a motion for articulation, when it stated that "[t]he contract between VitalWorks and [the plaintiff] is a contract for the sale of goods governed by [a]rticle [two] of the UCC." In addressing the plaintiff's breach of contract count, however, the court seemingly

analyzed the contract under the common law, without reference to the UCC.[4]

We conclude that the court chose the incorrect legal standard under which to analyze the breach of contract count because, as discussed previously, the UCC governs this agreement. Official comment 3 to § 1-201 of the UCC provides in relevant part that "[w]hether an agreement has legal consequences is determined by applicable provisions of the [UCC] and, to the extent possible provided in [§] 1-103, by the law of contracts." See General Statutes § 42a-1-201 (3). General Statutes § 42a-1-103 provides in relevant part: "(a) This title shall be liberally construed and applied to promote its underlying purposes and policies, which are . . . (3) To make uniform the law among the various jurisdictions. (b) Unless displaced by the particular provisions of this title, the principles of law and equity . . . supplement its provisions."

"While it is true that the [UCC] incorporates, by reference, supplementary general principles of contract law and of the law merchant, § 42a-1-103, such supplemental bodies of law cannot displace those provisions of the [UCC] that are directly applicable. Article [two] applies to all contracts for the sale of goods . . . ." *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 270, 439 A.2d 314 (1981). Official comment 2 to § 1-103 of the UCC explains that "while principles of common law and equity may *supplement* provisions of the [UCC], they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the [UCC] provides otherwise. In the absence of such a provision,

---

[4] The court analyzed the breach of contract count using the following case law, citing, inter alia, *Rosato* v. *Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004): "The elements of a cause of action for breach of contract are: '(1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages.' "

the [UCC] preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies." (Emphasis in original.) "Contracts of sale should be construed so as to sustain rather than defeat them, if this can reasonably be done." 67 Am. Jur. 2d 398, Sales § 230 (2003).

General Statutes § 42a-2-607 is directly applicable to the agreement in the present case. Section 42a-2-607 (3) provides in relevant part: "Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ." It was necessary that this section be used by the court in analyzing the plaintiff's breach of contract count.

Provision 1.8 of the contract requires that "[a]ny notice required or permitted to be given" under the contract "shall, except where specifically provided otherwise, be given *in writing* by personal delivery, certified mail, or overnight delivery to the address set forth herein for such party, and the date upon which such notice is received shall be deemed to be the date of such notice, irrespective of the date appearing thereon." (Emphasis added.) The record reveals undisputed testimony by Dr. Sara Mills, one of the physicians at the plaintiff practice, who testified that the plaintiff never provided the defendants with any written notice of default and, therefore, no written notice of breach.

"[Section 42a-2-607 (3)] sets up a condition precedent to a buyer's right to recover. . . . The buyer must plead and prove the giving of notice." (Citation omitted.) *DeLucia* v. *Coca-Cola Bottling Co.*, 139 Conn. 65, 67, 89 A.2d 749 (1952). "[C]omplaints as to the quality of goods furnished may be found to constitute a sufficient notice of a breach . . . . But that can be true only where the complaints under all the circumstances of

the case are such as reasonably to apprise the seller that the buyer intends to claim damages for the breach." *Truslow & Fulle, Inc.* v. *Diamond Bottling Corp.*, 112 Conn. 181, 189, 151 A. 492 (1930). The plaintiff did not notify VitalWorks in writing of the breach of contract, nor of its intention to claim damages resulting from the breach. Because such notice is a condition precedent to recovery under § 42a-2-607 (3) and under the contract, the plaintiff cannot prevail on the breach of contract count on which the court found in its favor but did not award damages.

B

Next we directly address whether the court erroneously concluded that commercial contract provisions governing warranty, the limitation of warranties and remedies were unenforceable, and that various statements preceding the execution of the contract made by salespeople created an express warranty between the plaintiff and VitalWorks.

The following additional facts are relevant to this claim. Provision 1.1 of the contract provides that "[t]his [a]greement and any schedules and attachments attached hereto constitutes the entire agreement between the parties and supersedes all prior or contemporaneous agreements, representations and proposals, written or oral except for [c]ustomer's obligations to pay support or other fees under existing contract(s), if any, between the parties."

The warranty section of the contract consists of two provisions. Provision 9.1 provides in relevant part: "VitalWorks warrants that, during the ninety-day period following the [g]o [l]ive [d]ate, the VitalWorks [s]oftware will substantially conform to the [d]ocumentation when used by the [c]ustomer in a manner that is consistent with the [d]ocumentation. VitalWorks does not warrant that the [s]oftware described herein will meet

[c]ustomer's requirements. Customer's sole and exclusive remedy for a breach of the foregoing software warranty will be, at VitalWorks' option, to repair or replace the non-conforming VitalWorks [s]oftware or return any payments [c]ustomer paid for the non-conforming VitalWorks [s]oftware and terminate this [a]greement. . . ." Provision 9.2, entitled "Warranty Limitations," provides: "OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT, VITALWORKS DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES TO CUSTOMER, WITH RESPECT TO THE SOFTWARE, THE DOCUMENTATION, THE HARDWARE, OR ANY SERVICES PROVIDED HEREUNDER OR OTHERWISE REGARDING THIS AGREEMENT. WITHOUT LIMITING THE FOREGOING, ANY IMPLIED WARRANTY OF MERCHANTABILITY, INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED AND DISCLAIMED."

The contract also limits the remedy available for damages, including damages from breach, under provision 11.1, which provides in boldface type that: "**In no event will VitalWorks be liable for any special, indirect, incidental, speculative, punitive, or consequential damages or loss of goodwill in any way relating to this [a]greement or resulting from the use of or inability to use the products or the performance or non-performance of any services, including, without limitation damages for loss of profits, data or use incurred by [c]ustomer or any third party, even if VitalWorks has been notified of the possibility of such damages.**" Provision 11.3 provides that the "[c]ustomer is a sophisticated purchaser and acknowledges and agrees that the allocation of risks in this [a]greement are reflected in the amounts due from [c]ustomer and other charges provided under this [a]greement . . . and that the allocation of risks under

this [a]greement are reasonable and appropriate under the circumstances."

The court found that "the limitation of liability created in the waiver of express warranty in the contract between [the plaintiff] and VitalWorks is unreasonable within the meaning of [General Statutes] § 42a-2-316 (1)[5] and is therefore unenforceable." Additionally, the court found that "[a]n implied warranty of fitness for a particular purpose exists in the agreement between the parties since VitalWorks as a software producer marketed and sold its product to [the plaintiff] for a particular purpose, and [the plaintiff] relied on the company's skills, as a software producer, to sell them appropriate products. In this case, the VitalWorks product, its installation and training failed utterly to perform as warranted. Moreover, because the goods purchased by [the plaintiff] were new, the contract language waiving the implied warranty of fitness for a particular purpose is unenforceable."

The court further clarified its decision with regard to its finding of unreasonableness and unenforceability of the express warranty in its memorandum dated February 23, 2010, addressing the defendants' motions to reargue. Specifically, "[t]he court found that the plaintiff was unsophisticated as to the particular subject matter of the contract, a complex dual system of computer software programs designed to interface with each other and [the] plaintiff's medical practice. The court further found that the system was not fully developed when VitalWorks sold it to [the] plaintiff as demonstrated in court by [the] defendants themselves and

---

[5] General Statutes § 42a-2-316 (1) provides: "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence negation or limitation is inoperative to the extent that such construction is unreasonable."

nonetheless, [the] defendants either refused to acknowledge this in the fac[e] of information from [the] plaintiffs, blaming [the] plaintiffs for the systemic software problems. Because [the] defendants represented they would develop a software system that would meet the purchaser's demonstrated needs, they gave an express warranty as that term is defined in General Statutes [§] 42a-2-313." The court further found that "[b]ased on the evidence presented at trial, the [c]ourt determined that by its 'representation . . . at the March 2003 conference, its onsite demonstration at [the plaintiff's office] in Albuquerque as well as subsequent correspondences with [the] [p]laintiff] throughout the remainder [of] 2003,' VitalWorks created an express warranty within the provisions of § 42a-2-313."

Once again the court addressed this issue in its memorandum of decision filed May 18, 2012, in response to the motion for articulation by VitalWorks' counsel. In this articulation, the court stated that "[the defendants] did not present any facts to support application of the contractual provisions of limitation of liability and limited contract remedies. The failure to deliver functioning software coupled with both defendants' own evidence that they were aware of the software function problems as developmental rather than user based precluded reliance on the contractual limited warranty and remedies. . . . [T]he subject contract required VitalWorks to sell software products which met industry standards and performed as represented by [the] seller. The subject products did not meet even minimum performance or quality standards. Defendant VitalWorks cannot use contractual limitation of liability and remedies as a shield for refusing to assure the software's fundamental functionality prior to placing it on the market and thereafter refusing to acknowledge and address the buyer's complaints of nonoperability of the systems."

The standard of review for this claim is plenary. "[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . [T]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face." (Citations omitted; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000). "[T]he interpretation of [definitive contract] language [is] a question of law subject to plenary review by this court." Id. If a contract is unambiguous within its four corners the determination of what the parties intended by their contractual commitments is a question of law. *Connecticut National Bank* v. *Rehab Associates*, 300 Conn. 314, 319, 12 A.3d 995 (2011).

Whether the language is ambiguous is itself a question of law, upon which our review on appeal is de novo. *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 669–70, 791 A.2d 546 (2002). "In determining whether a contract is ambiguous, the words of the contract must be given 'their natural and ordinary meaning.' . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent." (Citation omitted.) Id., 670. "Contract language is unambiguous when it has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." (Internal quotation marks omitted.) *Christian* v. *Gouldin*, 72 Conn. App. 14, 20, 804 A.2d 865 (2002). "The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations

of the language in question does not necessitate a conclusion that the language is ambiguous." (Citation omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC,* supra, 670.

"[A] presumption that the language used is definitive arises when . . . the contract at issue is between sophisticated parties and is commercial in nature." Id. "It is noteworthy that, in the majority of the cases considering contract interpretation a matter of law, the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power." *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L. P.,* supra, 252 Conn. 496.

In the present case, the court made no finding that the contract was ambiguous and, on the basis of our de novo review of the contract, we conclude that the contract indeed was unambiguous. The contract, specifically provisions 1.1, 9.1, and 9.2, contains clear language and manifests the parties' intent to be bound only by the express warranty contained in the written contract. There is no room for ambiguity or a difference of opinion as to what the language of these provisions means.

Furthermore, the contract at issue raises the presumption of definitiveness of its language. The contract is for the sale of goods and concomitant services. It is commercial in nature. The contract is between sophisticated commercial parties. Provision 11.3 of the contract, which was entitled "Allocation of Risk," provides that the "[c]ustomer is a sophisticated purchaser . . . and that the allocation of risks under this [a]greement are reasonable and appropriate under the circumstances." The relatively equal bargaining power between the parties also is present. There is no dispute

that the plaintiff had a copy of the contract before signing it and had its attorney complete her review before the plaintiff signed it. The plaintiff, therefore, had the advice of counsel prior to entering into the contract. The "[contract] at issue [is] commercial in nature and [was] made by sophisticated commercial parties with the advice of counsel [which] raise[s] a presumption of definitiveness that . . . has not been rebutted by any other evidence in the record. . . . [W]e conclude that the parties meant what they said and said what they meant, in language sufficiently definitive to obviate any need for deference to the trial court's factual findings . . . ." *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L. P.*, supra, 252 Conn. 496–97. The contract, therefore, is unambiguous and subject to our plenary review.

1

At trial, the plaintiff argued and the court agreed that VitalWorks' representations at the March, 2003 conference, on-site software demonstration, and subsequent correspondence through 2003, in addition to the warranty provision in the contract itself, created an express warranty that subsequently was breached. On appeal, VitalWorks argues that the court erred in finding an express warranty beyond the contract and that the contract limits the express warranty to what was contained in, and limited by, the contract. We agree with VitalWorks.

General Statutes § 42a-2-313 (1) provides that: "Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates

an express warranty that the goods shall conform to the description. (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model."

The plaintiff argues that VitalWorks' representations at the March, 2003 conference, onsite demonstration, and subsequent correspondence prior to the execution of the contract created additional express warranties. Provision 9.2 of the contract, however, limits the warranty only to that which was "EXPRESSLY SET FORTH IN THIS AGREEMENT . . . ." The conflict between the plaintiff's argument and the language of the contract, including provision 9.2, implicates the provisions of § 42a-2-316 (1), which address situations when there is some conflict between the creation of an express warranty and language limiting or negating such an express warranty. Section 42a-2-316 (1) provides that: "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence negation or limitation is inoperative to the extent that such construction is unreasonable."

The United States Court of Appeals for the Second Circuit has stated that "the creation of an express but unintended warranty applies only to statements that are not excluded by the parol evidence rule." *Telecom International America, Ltd.* v. *AT & T Corp.*, 280 F.3d 175, 194 (2d Cir. 2001). The Connecticut codification of the UCC parol evidence rule is found in General Statutes § 42a-2-202, which provides that: "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are

included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (a) by course of performance, course of dealing or usage of trade as provided by section 42a-1-303; and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

Provision 1.1 of the contract in the present case contains a merger clause, also known as an integration clause. "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement." *Tempo Shain Corp.* v. *Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997). "Regardless of what such parol evidence might suggest, we may not consider it because the agreement is unambiguous on its face and because the agreement contains a valid general merger clause." *North Atlantic Instruments, Inc.* v. *Haber*, 188 F.3d 38, 48 (2d Cir. 1999). The effect of such a clause is that prior or contemporaneous parol evidence is excluded from consideration in determining the scope of the contract. Testimony regarding VitalWorks' representations at the March, 2003 conference, onsite software demonstration, and subsequent correspondence prior to the execution of the contract is parol evidence precluded from altering or being used to interpret the agreement, which was completely integrated by the contract's merger clause. The plaintiff is, therefore, limited to the language of the contract with respect to the warranties.

A reasonable reading of the express warranty in the contract and warranty limitation provisions of the contract is that they are consistent with each other. The express warranty disclaimer limits the effect of any express warranty "OTHER THAN AS EXPRESSLY SET

FORTH IN THIS AGREEMENT . . . ." The express warranty in provision 9.1 can be reasonably and consistently read with this limitation and the two provisions can be reasonably read together. The only express warranty is that which is in the contract, namely, in provision 9.1. Provision 9.1 provides that "during the ninety-day period following the [g]o [l]ive [d]ate, the VitalWorks [s]oftware will substantially conform to the [d]ocumentation when used by the [c]ustomer in a manner that is consistent with the [d]ocumentation."

### 2

The court also found that VitalWorks did not effectively waive the warranties implied under law in the contract. We disagree.

Provision 9.2 of the contract also addresses the implied warranties. It states, in relevant part: "VITALWORKS DOES NOT MAKE ANY . . . IMPLIED WARRANTIES TO [THE PLAINTIFF] . . . . WITHOUT LIMITING THE FOREGOING, ANY IMPLIED WARRANTY OF MERCHANTABILITY, INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED AND DISCLAIMED." Section 42a-2-316 (2) provides: "Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

We first address the implied warranty of merchantability. The contract effectively disclaims this implied warranty. The language in provision 9.2 mentions merchantability in satisfaction of § 42a-2-316 (2). Because

the disclaimer is in writing, it must also be conspicuous under § 42a-2-316 (2). "Conspicuous" is defined by General Statutes § 42a-1-201 (10) to "[mean] so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision for the court. Conspicuous terms include the following: (A) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font or color to the surrounding text of the same or lesser size; and (B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language."

Although the heading of provision 9.2 is the same font and typeface as the other provision headings, the language of the entire provision is in capital letters. This is in contrast with the language of other provisions, which are a mix of upper and lowercase letters. Provision 9.2 was presented in such a way that a reasonable person against which it was to operate ought to have noticed. General Statutes § 42a-1-201 (10); see also *Emlee Equipment Leasing Corp.* v. *Waterbury Transmission, Inc.*, 31 Conn. App. 455, 471, 626 A.2d 307 (1993). Provision 9.2 of the contract, therefore, effectively disclaims the implied warranty of merchantability.

We next address whether the implied warranty of fitness was effectively disclaimed. In order to effectively disclaim, under § 42a-2-316 (2), any implied warranty of fitness, the disclaimer must be (1) in writing and (2) conspicuous. Provision 9.2 of the contract addresses the implied warranty of fitness, in addition to the implied warranty of merchantability. The provision is in writing and, as discussed previously, is conspicuous.

Provision 9.2 of the contract, therefore, effectively disclaims the implied warranty of fitness.[6] VitalWorks effectively disclaimed the implied warranties of merchantability and fitness.

## II

VitalWorks next claims that the court erred in finding negligent misrepresentation. We agree.

The court found that "VitalWorks sales personnel [Tim] Holman misrepresented material facts with respect to the Kiron system to induce [the plaintiff] to purchase the VitalWorks . . . software. Holman and other VitalWorks employees represented that the system VitalWorks sold to [the plaintiff] would enable it to integrate the administrative, billing and medical records functions of its two locations, increase efficiency, reduce personnel needs and result in a return on the investment in two years. Additionally, Holman also urged [the plaintiff] to purchase the system by December 31, 2003 to avoid a 15 percent price increase. . . . Because (1) the system was not mature enough to be released for public sale, (2) VitalWorks did not provide

---

[6] It should be noted that despite the court holding that "because the goods purchased by [the plaintiff] were new, the contract language waiving the implied warranty of fitness for a particular purpose is unenforceable" under General Statutes § 42a-2-316 (5), that subsection is inapplicable to this contract. Section 42a-2-316 (5) provides: "The provisions of subsections (2), (3) and (4) shall not apply to sales of new or unused *consumer* goods, except for those goods clearly marked 'irregular,' 'factory seconds' or 'damaged.' Any language, oral or written, used by a seller or manufacturer of *consumer* goods, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, shall be unenforceable." (Emphasis added.) General Statutes § 42a-1-201 (11) defines "consumer" as "an individual who enters into a transaction primarily for personal, family or household purposes." The contract in the present case is between two businesses and the goods that were the subject of the contract were not primarily for personal, family or household purposes, but rather for the plaintiff's business use. Section 42a-2-316 (5), therefore, does not apply to this contract and does not render § 42a-2-316 (2) inapplicable.

adequate or effective training and (3) inst[a]llation was not proper or complete, VitalWorks should be held responsible to [the plaintiff] for losses resulting from these misrepresentations."

"Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact." *McClintock* v. *Rivard*, 219 Conn. 417, 427, 593 A.2d 1375 (1991). "As such we will review the findings of the court as to negligent misrepresentation and reverse the judgment as to that claim only if the findings are clearly erroneous." *Johnnycake Mountain Associates* v. *Ochs*, 104 Conn. App. 194, 202, 932 A.2d 472 (2007), cert. denied, 286 Conn. 906, 944 A.2d 978 (2008). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 70, 699 A.2d 101 (1997). We are left with the definite and firm conviction that such a mistake has been made in the present case.

"[A]n action for negligent misrepresentation requires a plaintiff to prove that (1) the defendant made a misrepresentation and (2) the plaintiff reasonably relied upon that misrepresentation." *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 364, 824 A.2d 1 (2003). The specific misrepresentations that the court found were those "by VitalWorks sales employee Holman that: (1) the Kiron system [the plaintiff] was using was going to be 'sunsetted' and therefore tech support would not continue, and (2) the VitalWorks product, a combination of the Intuition PM and EMR software, would enable [the plaintiff] to integrate all of its administration scheduling, billing, patient recordkeeping functions with clinical charting by [the plaintiff's] doctors for both its eastside and westside offices."

As stated previously in part I B 1 of this opinion, provision 1.1 of the contract contains a merger clause. The clause states that "[t]his [a]greement . . . constitutes the entire agreement between the parties and supersedes all prior or contemporaneous agreements, representations and proposals, written or oral . . . ." The effect of such a merger clause on a common-law misrepresentation claim has not been explored fully by the state of Connecticut. The United States Court of Appeals for the Second Circuit, however, has addressed a similar situation concerning the effect of a merger clause on a statutory claim under Rule 10b-5 for misrepresentation in a securities context. See *ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007). The Second Circuit held that "to the extent [the plaintiff's] causes of action are based on alleged misrepresentations made during negotiations preceding the defendants' investment, those claims are barred by the merger clauses." Id., 105.

"Where the very instrument that creates the required [relationship] to support a claim of negligent misrepresentation expressly provides that neither party is relying upon representations or statements not contained in the contract, there can be no cause of action based on negligent statements or promises allegedly made before such a contract is executed." 37 Am. Jur. 2d 161, Fraud and Deceit § 130 (2001); see also *Chase Manhattan Bank* v. *Edwards*, 87 App. Div. 2d 935, 936, 450 N.Y.S.2d 76 (1982), aff'd, 59 N.Y.2d 817, 451 N.E.2d 486, 464 N.Y.S.2d 739 (1983).

The court found that VitalWorks made two misrepresentations in satisfaction of the first element of the common-law claim of negligent misrepresentation. The court also found the second element of a claim for negligent misrepresentation to be satisfied, namely, that the plaintiff reasonably relied on the misrepresentation. Given the presence of the merger clause in the contract

and the fact that these representations were made prior to the signing of the contract, however, it would be unreasonable for the plaintiff to rely on these representations. The representations were made prior to the plaintiff signing the contract. Such representations were explicitly superseded by the merger clause. The language of the merger clause made it clear to the plaintiff that VitalWorks did not intend to be bound by any representation made prior to the contract being signed and, therefore, reliance by the plaintiff on any such representation would not have been reasonable. See *Retrofit Partners I, L.P.* v. *Lucas Industries, Inc.*, 201 F.3d 155, 162–63 (2d Cir. 2000). We conclude that the defendants have shown that it was clearly erroneous for the court to have found that the plaintiff reasonably relied on these representations, which were not set forth in the contract, in satisfaction of the elements of its common-law misrepresentation claim.

## III

On appeal, VitalWorks and Cerner both claim that the court erred in concluding that CUTPA applies to this case. The defendants contend that by its terms CUTPA does not apply. The defendants also contend that an outcome determinative conflict of laws exists regarding whether the plaintiff could claim a CUTPA violation sounding in tort against VitalWorks and Cerner.

The court found in favor of the plaintiff on its CUTPA claims against both defendants. In the court's memorandum of decision dated February 23, 2010, regarding the defendants' motions to reargue, the court addressed why Connecticut law applied. "[T]he court applied [the] principles of Connecticut conflict of law . . . to find based on the facts of this case that Connecticut is the state which has the most significant relationship to the occurrence and the parties." The court, in evaluating

the choice of law, did not utilize the doctrine of lex loci delicti, but rather § 145 (1) and 6 (2) of the Restatement (Second) of Conflict of Laws (1971) because it held that "*lex loci delicti* would produce an arbitrary or irrational result." (Emphasis in original.)

In the court's memorandum of decision in response to VitalWorks' motion for articulation, the court further explained its reasoning on applying Connecticut law. The court stated: "The strongest and most predictable contact was Connecticut. VitalWorks' choice of law requirement in the purchase agreement reinforced this conclusion. . . . By its terms CUTPA applies to acts committed in Connecticut . . . . [T]he acts which gave rise to [the] plaintiff's claims occurred in Connecticut. . . . The location of the party responsible for the wrongful, tortious conduct toward [the] plaintiff is Connecticut . . . . Applying Connecticut law to all [the] plaintiff's claims . . . provides for the most consistent, rational and fair application of law to the facts of this case." (Citations omitted; internal quotation marks omitted.) The court interpreted provision 1.6[7] of the contract as "stipulating that the law of the state of Connecticut [w]as the law applicable to its construction and interpretation and Connecticut [w]as the forum for dispute resolution." The court also concluded that "VitalWorks engaged in trade or commerce under CUTPA . . . ."

Cerner makes an argument, which VitalWorks also echoes later in its brief, that, regardless of whether Connecticut law applies, the plaintiff is unable to satisfy the requirements for a CUTPA claim. We agree.

---

[7] Provision 1.6 of the contract states: "Dispute. The parties will make reasonable efforts through negotiation to settle any disputes arising out of or related to this [a]greement. This [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of Connecticut and any dispute shall be resolved in a forum located in the [s]tate of Connecticut."

We begin by setting forth our well settled standard of review regarding statutory interpretation. "Issues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[8] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 847, 937 A.2d 39 (2008).

Section 42-110b (a) provides that "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade

---

[8] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

or commerce." "Trade" and "commerce" are defined under General Statutes § 42-110a (4) as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state*." (Emphasis added.) The meaning of § 42-110b (a) is plain and unambiguous; it proscribes only unfair trade practices occurring within the state of Connecticut.[9]

We agree with the defendants that the "trade" or "commerce" practices complained about by the plaintiff were not "in this state" within the plain meaning of § 42-110b. While VitalWorks admits to being a Delaware corporation and the court found that Ridgefield, Connecticut, was its corporate headquarters, the complained about activities did not involve the advertising, sale, rent, lease, offering for sale, rent or lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, and other article, commodity or thing of value in Connecticut.

The plaintiff is located in New Mexico. Cerner purchased VitalWorks in January, 2005, and was not a party to the contract in dispute. Cerner is a Delaware corporation with a principal place of business in Missouri. The first product demonstration by VitalWorks to the plaintiff happened at a California medical conference and the second product demonstration took place at the plaintiff's New Mexico office. The goods, software, and

---

[9] But see *Valtec International, Inc.* v. *Allied Signal Aerospace Co.*, United States District Court, Docket No. 3:93CV01171 (WWE) (D. Conn. March 7, 1997) ("where choice-of-law principles dictate that the law of Connecticut should be applied, a cause of action may exist under CUTPA even though none of the acts complained of took place in Connecticut"); see also *USGI, Inc.* v. *Michele Ltd. Partnership*, United States District Court, Docket No. B-88-229 (JAC) (D. Conn. January 26, 1991). We are unpersuaded by the federal courts' reasoning, which runs counter to the plain meaning rule encapsulated in § 1-2z.

hardware purchased under the contract were installed in New Mexico and the concomitant services were also performed in that state.

Mills admitted in her undisputed testimony that the VitalWorks employees with whom the plaintiff dealt were located in Alabama. She also admitted that the defendants' employees in Alabama remotely loaded software onto the plaintiff's hardware in New Mexico. Furthermore, James Kasper, a senior software architect for the specialty practice manager at Cerner, who was also employed by VitalWorks, provided undisputed testimony that all of the work on the software from 2001, forward, including the version the plaintiff purchased, was performed in Alabama.

In short, no "trade" or "commerce" within the meaning of § 42-110b (a) and § 42-110a (4) occurred in Connecticut.[10] Connecticut only served as the corporate headquarters at the time of the execution of the contract and for about a year after until VitalWorks was acquired by Cerner. We decline to give extraterritorial effect to § 42-110a (4) for actions taken in the pursuit of trade or commerce occurring wholly outside the state. The plain meaning of §§ 42-110b (a) and 42-110a (4) does not authorize CUTPA claims regulating trade or commerce occurring outside the state.

Despite the clear words of the statute, some decisions involving CUTPA claims stemming from multistate

---

[10] The plaintiff has referred to a single credit card payment form in the court exhibits that contained the instruction for the completed form to be returned to VitalWorks in Ridgefield, Connecticut, as illustrative of VitalWorks receiving payment, therefore conducting commerce, in Connecticut. Mills testified that this form and its amount was for the balance the plaintiff owed for the software. She further testified, however, that she had no personal knowledge where the completed form was sent. VitalWorks argues that there was no evidence that the form was sent to or processed in Connecticut. The court, however, made no finding as to where any or all of the payments were made in relation to the state of Connecticut. This evidence is problematic, but, as an appellate court, we cannot find facts, including whether such payment was received or processed in Connecticut.

activities have employed choice of law principles to determine whether CUTPA applies to the defendant's conduct. See *Cohen* v. *Roll-A-Cover, LLC*, 131 Conn. App. 443, 464–65, 27 A.3d 1, cert. denied, 303 Conn. 915, 33 A.3d 739 (2011). Consequently, we engage in such an analysis and come to the same conclusion, namely, that CUTPA should not apply to the defendants' actions.

Before proceeding to the choice of law analysis, we address the plaintiff's argument that no additional choice of law analysis is needed because provision 1.6 of the contract is a choice of law and forum selection clause, which "intended to subject purchasers to both a Connecticut forum and Connecticut substantive law," such that the court need not engage in a choice of law analysis. We disagree. Provision 1.6 contains two litigation provisions. First, it requires that the contract itself "shall be construed and interpreted in accordance with the laws of the [s]tate of Connecticut." Second, it requires that "any dispute shall be resolved in a forum located in the [s]tate of Connecticut."

Taking the second prong of provision 1.6 of the contract first, we consider it to be a forum selection clause. "A forum selection clause is a contractual provision agreed to by private parties that constitutes the parties' agreement as to the place of the action where the parties will bring any litigation related to the contract. Restatement (Second) of Conflict of Laws § 80 (1971)." *Cagle* v. *Mathers Family Trust*, 295 P.3d 460, 464 (Colo. 2013) (en banc). We regard this clause as merely designating the forum in which the parties agreed to litigate.

The first prong of this provision is not a complete choice of law clause, as the plaintiff argues, but rather it only addresses the construction and interpretation of the contract itself. Such construction and interpretation of the contract was to be done in accordance with the laws of the state of Connecticut. The provision does

not choose, however, what law should be used to decide issues not involving the construction or interpretation of the contract. CUTPA was intended by the legislature to be remedial to address people who "engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a) and (d).

The applicability of CUTPA is not an issue of construction or interpretation of the contract. Provision 1.6 of the contract, therefore, does not authorize the invocation of CUTPA, or require its applicability. The choice of law and forum selection clause for which the parties contracted was restrictive and does not open the door to the plaintiff's CUTPA claims sounding in tort. Because provision 1.6 does not choose the law applicable to torts alleged in connection with the contract, we must engage in a choice of law analysis.

In order to address the defendants' claim regarding the applicability of CUTPA, we must first address the court's choice of law decision. We exercise plenary review over choice of law questions. *American States Ins. Co.* v. *Allstate Ins. Co.*, 282 Conn. 454, 461, 922 A.2d 1043 (2007).

Connecticut choice of law principles "traditionally [adhere] to the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury, or lex loci delicti." *O'Connor* v. *O'Connor*, 201 Conn. 632, 637, 519 A.2d 13 (1986). This doctrine was slightly modified in *O'Connor*, which holds that when the "application of the doctrine of lex loci delicti would produce an arbitrary, irrational result" we should turn to and "incorporate the guidelines of the Restatement [(Second) of Conflict of Laws] as the governing principles . . . ." Id., 650.

We must first determine whether lex loci delicti would produce an arbitrary, irrational result. The trial court found that "New Mexico is the place where [the] plaintiff suffered injury . . . ." Under lex loci delicti, the law of New Mexico would govern the rights and obligations arising out of the alleged unfair trade practices. If the application of lex loci delicti, which applies New Mexico law, produces an arbitrary, irrational result, then we must look to the Restatement (Second) of Conflict of Laws. The application of the doctrine of lex loci delicti, however, will not produce an arbitrary or irrational result.

Although the *O'Connor* court, in abandoning categorical allegiance to lex loci delicti, did not abstractly define what an "arbitrary, irrational result" would be, it did provide an example of one such result. The choice of law question in *O'Connor* was between the law of the location of the automobile accident where the tort was committed, Quebec, Canada, and the law of the domicile of both parties to this accident, Connecticut. *O'Connor* v. *O'Connor*, supra, 201 Conn. 634. The *O'Connor* court described the application of lex loci delicti, which would have applied Quebec law, as "mak[-ing] [a] determination of the governing law [that] turn[s] upon a purely fortuitous circumstance: the geographical location of the parties' automobile at the time the accident occurred. Choice of law must not be rendered a matter of happenstance, in which the respective interests of the parties and the concerned jurisdictions receive only coincidental consideration. . . . Applying the same rationale, the United States District Court for the District of Connecticut has refused to adhere to the lex loci doctrine in a case where the plaintiffs, Connecticut residents, were killed in an airplane crash in West Virginia." (Citations omitted.) Id., 646.

Our Supreme Court reached the similar conclusion in *Dugan* v. *Mobile Medical Testing Services, Inc.*, 265

Conn. 791, 830 A.2d 752 (2003), that employing lex loci delicti would produce an irrational, arbitrary result, such that the Restatement (Second) of Conflict of Laws was employed. In *Dugan*, the plaintiff, a Connecticut domiciliary, sued a New York medical services provider, hired by his New York employer, to conduct a physical examination. Id., 793. The plaintiff was examined in New York and was told after the examination that his electrocardiogram was fine, however, less than two months later, the plaintiff suffered a heart attack in Connecticut. Id., 793–94. More than a week after his heart attack, "the plaintiff received a summary of his examination results from [the defendant], which informed the plaintiff that his [electrocardiogram] was abnormal and suggested that he should seek a follow-up consultation with his own physician." Id., 794.

Our Supreme Court concluded that "New York has the greater contact with the parties in this case. . . . [T]he most significant factor is that [the defendant] administered fitness for duty examinations to the plaintiff and other employees of a New York fire department. . . . Thus, although the plaintiff's domicile is a relevant factor, we believe that his status as a New York firefighter is more significant under the circumstances." Id., 804. The *Dugan* court "acknowledge[d] that Connecticut's relationship to the present controversy might not be as fortuitous as Quebec's relationship to the controversy in *O'Connor* . . . [because] the plaintiff is a Connecticut domiciliary and [the fact] that he suffered his heart attack in Connecticut are circumstances that are merely incidental to the . . . controversy." (Citation omitted.) Id.

In the present case, the place of the plaintiff's injury, New Mexico, did not turn upon a fortuitous circumstance, nor was the fact that the injury happened in New Mexico a matter of happenstance. The plaintiff was located in New Mexico at the beginning and

throughout its contractual relationship with the defen-
dants, while the corporate location of the defendants
shifted from Connecticut to Cerner's Missouri principal
place of business. The goods and concomitant services
purchased under the contract were installed and per-
formed in New Mexico as per the agreement.

Unlike in *O'Connor*, New Mexico is the place of injury
in the present case, not by the happenstance of the
plaintiff passing through the state, but by the plaintiff
operating its well established business there since 1997,
and utilizing the defendants' goods and services from
the contract in New Mexico. Like in *Dugan*, however,
the fact that VitalWorks had its corporate headquarters
in Connecticut, until it was acquired by Cerner, is a
circumstance merely incidental to the alleged tortious
conduct. Connecticut then ceased to be the corporate
headquarters about a year into the plaintiff's contractual
relationship with VitalWorks when Cerner, a company
not in Connecticut, acquired it. The choice of law
resulting from applying lex loci delicti, i.e., New Mexico
law, is not an arbitrary, irrational result, such that the
choice of law analysis may stop there under *O'Connor*
and New Mexico law should apply.

Even if we were to apply the Restatement (Second)
of Conflict of Laws to this case, New Mexico law would
still apply. Section 145 of the Restatement (Second) of
Conflict of Laws provides in subsection (1) that "[t]he
rights and liabilities of the parties with respect to an
issue in tort are determined by the local law of the
state which, with respect to that issue, has the most
significant relationship to the occurrence and the par-
ties under the principles stated in § 6." Section 6 of
the Restatement (Second) of Conflict of Laws, in turn,
provides: "(1) A court, subject to constitutional restric-
tions, will follow a statutory directive of its own state
on choice of law. (2) When there is no such directive,
the factors relevant to the choice of the applicable rule

of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protections of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Section 145 (2) of the Restatement (Second) of Conflict of Laws "establishes black-letter rules of priority to facilitate the application of the principles of § 6 to tort cases." *O'Connor v. O'Connor*, supra, 201 Conn. 652. Section 145 (2) provides: "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue."

We commence our analysis under the Restatement (Second) of Conflict of Laws by reviewing the specific contacts enumerated in § 145 (2). With regard to § 145 (2) (a), the injury occurred in New Mexico. Section 145 (2) (b) examines the place where the conduct causing the injury occurred. This conduct happened in New Mexico, where the goods were installed, service was provided, and training occurred. Remote service and installation was also provided to New Mexico by the defendants' employees in Alabama, which was where the software version that was the subject of the plaintiff's complaint was produced. Furthermore, the product was demonstrated to the plaintiff once in California and again in New Mexico. To the extent that the torts

arose from the execution of the contract itself, the contract was drafted by VitalWorks in Connecticut, but reviewed by the plaintiff's counsel in New Mexico before Mills signed it there, as the plaintiff's agent.

Section 145 (2) (c) contemplates the place of incorporation and/or place of business of the parties. The plaintiff is located and incorporated in New Mexico, VitalWorks had corporate headquarters in Connecticut and was incorporated in Delaware and Cerner has its place of business in Missouri and is incorporated in Delaware. Finally, § 145 (2) (d) asks where the relationship between the parties was centered. The relationship between the plaintiff and the defendants was centered in New Mexico. The plaintiff reviewed and signed the contract, beginning the relationship, in New Mexico. The goods and concomitant services contracted for were delivered, installed, and performed in New Mexico. Despite the VitalWorks to Cerner transition and the associated corporate location transition, the location of the goods and services never changed from New Mexico.

"[I]t is the significance, and not the number, of § 145 (2) contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach. As the concluding sentence of § 145 (2) provides, [t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." (Internal quotation marks omitted.) *Jaiguay* v. *Vasquez*, 287 Conn. 323, 353, 948 A.2d 955 (2008). Upon evaluating the relative importance of each factor, we conclude that New Mexico had the greatest contact with the parties in this case.

The factors enumerated in § 6 (2) of the Restatement (Second) of Conflict of Laws also militate in favor of applying New Mexico law. Section 6 (2) (b) and (c) directs us to examine the policies of Connecticut and

New Mexico, respectively. CUTPA "must be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 213, 680 A.2d 1243 (1996). CUTPA seeks to remedy unfair or deceptive acts or practices in the conduct of any trade or commerce. General Statutes § 42-110b (a). The legislature defines "trade" and "commerce" by detailing specific acts "in this state." General Statutes § 42-110a (4). Connecticut's policy interest in CUTPA, thus, seems limited to trade or commerce in Connecticut and, as discussed previously, such trade or commerce did not happen in Connecticut.

New Mexico's policy can be gleaned from its unfair trade practices statute, N.M. Stat. § 57-12-1 et seq. N.M. Stat. § 57-12-3 states that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." New Mexico defines "trade" or "commerce" as "the advertising, offering for sale or distribution of any services and any property and any other article, commodity or thing of value, including any trade or commerce directly or indirectly affecting the people of this state." N.M. Stat. § 57-12-2 (C). New Mexico's policy interest is, therefore, to protect the people of New Mexico from these unfair trade practices that affected them. The New Mexico statute focuses on the effect of such practices on the people of its state, unlike Connecticut's statute, which focuses on where the unlawful conduct to be regulated occurred.

We next examine the factor under § 6 (2) (d) of the Restatement (Second) of Conflict of Laws, namely, the "protection of justified expectations." There is no justified expectation that conduct related to the contract would be subject to Connecticut law. As previously discussed, provision 1.6 of the contract contains a forum selection clause selecting Connecticut as the

forum, but the choice of law component in provision 1.6 is limited to the construction and interpretation of the contract itself. Because the choice of law component of provision 1.6 is restrictive, there is no justified expectation that Connecticut law, including CUTPA, would apply to tort claims not arising from the construction and interpretation of the contract itself.

Section 6 (2) (e) of the Restatement (Second) of Conflict of Laws asks us to examine the basic policies underlying the particular field of law. "[T]he deterrence of tortious conduct and the provision of compensation for the injured victim, underlie the tort field." Restatement (Second) § 145, supra, comment (b). CUTPA, specifically, is remedial in nature. General Statutes § 42-110b (d). The New Mexico analog to CUTPA is also remedial legislation. *Truong* v. *Allstate Ins. Co.*, 147 N.M. 583, 591, 227 P.3d 73 (2010).

Finally, we examine § 6 (2) (f) and (g) of the Restatement (Second) of Conflict of Laws together, which, respectively, require us to consider the certainty, predictability and uniformity of the result and the ease in the determination and application of the law to be applied. Although our Supreme Court and the Restatement (Second) of Conflict of Laws "cautions against attaching independent weight to these auxiliary factors, noting that they are ancillary to the goal of providing rational, fair choice of law rules"; *O'Connor* v. *O'Connor*, supra, 201 Conn. 651; this is an instance where these factors would provide a rational, fair result. Applying the law of the place of the injury, New Mexico, is a certain, predictable, and uniform result because the vast majority of the plaintiff's contact with the defendants happened in New Mexico. It would, therefore, be predictable and uniform, as well as easy to determine and apply, for the state where the defendants delivered and installed the goods, as well as provided

the concomitant services, to be the law utilized to remedy a tort arising from an unfair trade practice. After consideration of the § 6 (2) factors, New Mexico law, and not Connecticut's CUTPA, would apply to the plaintiff's count of unfair trade practices. We conclude, therefore, that the court improperly determined that CUTPA applied.

## IV

VitalWorks' fourth issue raised on appeal, which was also raised by Cerner, is whether the court improperly ordered costs for the plaintiff's expert witness under CUTPA. In light of our conclusion, in part III of this opinion, that CUTPA does not apply to the plaintiff's claim of unfair trade practices, the court improperly ordered costs for the plaintiff's expert witness under CUTPA.

The trial court awarded $45,000 as "reimbursement for fees charged by Dr. Kursh" under General Statutes § 42-110g (d).[11] The plaintiff is not entitled to these fees because this award was premised on the plaintiff's CUTPA claim. The plaintiff "must prevail on the CUTPA cause of action before such fees and damages must be awarded. See *Connelly* v. *Housing Authority*, 213 Conn. 354, 360, 567 A.2d 1212 (1990)." *Vezina* v. *Nautilus Pools, Inc.*, 27 Conn. App. 810, 821, 610 A.2d 1312 (1992). Because the plaintiff could not maintain a claim under CUTPA and, thus, could not prevail under CUTPA, the plaintiff could not recover expert witness fees under § 42-110g (d).

## V

VitalWorks' final issue on appeal is whether the court erred in precluding testimony from two of its expert

---

[11] General Statutes § 42-110g (d) provides in relevant part: "In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery."

witnesses, Kasper and Randy Brown, regarding their opinions based upon review of a backup copy of the software. The plaintiff's original complaint contained the following six counts: (1) breach of contract, (2) breach of warranty, (3) fraud, (4) negligent misrepresentation, (5) unjust enrichment, and (6) CUTPA. The court found against the plaintiff on the fraud and unjust enrichment counts, which are unchallenged by the plaintiff on appeal. We have addressed the issues raised on appeal by the defendants with respect to the breach of contract, breach of warranty, negligent misrepresentation, and CUTPA counts, in parts I, II and III of this opinion, respectively, and have reversed the court's judgment with respect to these counts in favor of the defendants. Accordingly, we need not decide VitalWorks' claim regarding the court's preclusion of testimony by two of its experts because VitalWorks already has prevailed on all counts against it.

## VI

On appeal, Cerner put forth four additional issues that did not overlap with the issues raised on appeal by VitalWorks, such that we have not yet addressed these issues in our decision, but will do so now. Cerner claims that the trial court erred: (1) by imposing successor liability on Cerner, (2) finding Cerner liable for violating CUTPA, (3) awarding damages to the plaintiff, and (4) awarding attorney's fees to the plaintiff.

The plaintiff's second amended complaint only addressed two of its six claims to Cerner's conduct: (1) count five, alleging unjust enrichment and (2) count six, alleging a CUTPA violation. The court found for both defendants on the unjust enrichment claim and for the plaintiff on the CUTPA claim. The claims raised by Cerner on appeal, thus, only relate to its liability in relation to CUTPA. Even if we were to assume, without deciding, that Cerner was a continuation of VitalWorks

and, therefore, subject to successor liability, the only liability imposed on Cerner by the court was under the plaintiff's CUTPA claim. As we previously have concluded in part III of this opinion, because the plaintiff could not maintain a claim of unfair trade practices under CUTPA, Cerner could not be liable for violating CUTPA and could not be responsible for the damages and attorney's fees awarded to the plaintiff for such a violation.

## VII

The plaintiff filed a separate, but related, appeal on December 16, 2011. The plaintiff raised the following four claims on appeal: (1) whether the court abused its discretion in declining to award punitive damages to the plaintiff; (2) whether the court erred in declining to award prejudgment interest to the plaintiff; (3) whether the court abused its discretion in reducing the amount of attorney's fees that could be recovered by the plaintiff; and (4) whether the court abused its discretion in refusing to award certain costs to the plaintiff.

Claim one challenges the court's refusal to award punitive damages against either defendant under CUTPA, claim three challenges the court's refusal to award the plaintiff the full amount of attorney's fees requested under CUTPA, and claim four challenges the court's refusal to award costs, in addition to those which it did award for Kursh's expert testimony, under CUTPA. On appeal, these three claims fail because, as we previously have concluded in part III of this opinion, the plaintiff could not prevail on, let alone maintain, a claim of unfair trade practices under CUTPA, and, as such, is not entitled to punitive damages, attorney's fees and costs under CUTPA.

With regard to claim two, the plaintiff argues that the defendants failed to refund the plaintiff for the software or compensate the plaintiff for new software, such

that the court erred in denying the plaintiff prejudgment interest. As we concluded in part I of this opinion, however, the plaintiff is foreclosed from recovering under the contract, either for breach of contract or warranty, such that there could not be money due to the plaintiff that would have been subject to prejudgment interest because it provided no written notice of default to the defendants.

The judgments against the defendants are reversed and the case is remanded to the trial court with direction to render judgments in favor of the defendants on all counts. The plaintiff's appeal is dismissed.

In this opinion the other judges concurred.