******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MANIVANNAN SOLAIRAJ ET AL. *v.* MANNARINO
BUILDERS, INC.
(AC 37988)

DiPentima, C. J., and Beach and Pellegrino, Js.*

*Argued May 19—officially released September 6, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Peck, J.)

*Doris B. D'Ambrosio*, for the appellants (plaintiffs).

*James H. Howard*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiffs, Manivannan Solairaj and Malini Manivannan, appeal from the judgment rendered after a trial to the court in favor of the defendant, Mannarino Builders, Inc. On appeal, the plaintiffs claim that the court's findings underlying its conclusions that (1) the plaintiffs breached the purchase agreement and (2) the defendant did not breach the agreement were clearly erroneous. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the trial court in its memorandum of decision, and procedural history, are relevant to our determination of this appeal. On November 20, 2010, the parties entered into a purchase agreement for the construction of a new house located in the town of South Windsor (town). Pursuant to the purchase agreement, the defendant agreed to construct and sell the house to the plaintiffs, and the plaintiffs agreed to purchase the house. The purchase price of the house was $594,000 to be paid in the following increments: $2500 at the time of signing the purchase agreement, $56,800 additional deposit at the time of signing the final house plan, and $534,700 at closing.[1] The purchase agreement provided for a closing date on or about March 6, 2011. During the construction, the plaintiffs notified the defendant of their concerns regarding the quality of the flooring and the water in the basement. A dispute as to the quality of the construction ensued and the parties' relationship deteriorated.

On March 30, 2011, the plaintiffs filed a notice of lis pendens on the town land records and, shortly thereafter, commenced this action. The defendant filed an application to discharge the lis pendens, and a hearing was held on June 7, 2011. At the hearing on the lis pendens, the court, *Aurigemma, J.*, determined that the plaintiffs were not "ready, willing and able to purchase the property as required in order to maintain an action for specific performance." Therefore, the court discharged the lis pendens. Shortly thereafter, the defendant sold the house to a third party.

The plaintiffs' original complaint alleged the following causes of action: specific performance, breach of the purchase agreement, a violation of the Connecticut Unfair Trade Practices Act (CUTPA) General Statutes § 42-110b et seq., intentional infliction of emotional distress and negligent infliction of emotional distress. Thereafter, the defendant filed an answer, special defense and counterclaim alleging tortious interference "with prospective economic gain." The plaintiffs amended their complaint to delete the count alleging specific performance. The trial was held in October, 2013; a hearing on the posttrial briefs was held on December 8, 2014, at which time the plaintiffs withdrew their emotional distress claims.

In its April 7, 2015 memorandum of decision, the court, *Peck, J.*, made the following findings. In January, 2011, the plaintiffs notified the defendant of their concerns regarding the water in the basement and the vibration of the floor in the family room. On January 31, 2011, Robert Mannarino, the president of the defendant, sent an e-mail responding to the plaintiffs' concerns. Mannarino assured the plaintiffs that he had identified the issue concerning the water in the basement, which was leaking in from the water collected in the front stoop, and he would address it. Mannarino further stated that he did not find any issue with the flooring, but it could be inspected at the next site visit.

On February 4, 2011, the site visit took place and soon after, on February 10, 2011, the plaintiffs e-mailed the defendant further expressing their concerns regarding the quality of the flooring and the water leaks in the basement. In the plaintiffs' e-mail, they demanded that the defendant meet a list of conditions including (1) a detailed explanation of the cause of the floor vibrations and a resolution through engineering means, (2) waterproofing of the basement to be done from the exterior of the house, (3) a certificate of inspection on the waterproofing of the basement walls, (4) a certificate from the engineering team as to the waterproofing done from the exterior, and (5) an additional ten year warranty on the structure of the house at no additional cost and warranting that the defendant will remedy any issues within one month. The plaintiffs further stated, in their e-mail, that they were not willing to close on the house until all their conditions were met and that they would terminate the purchase agreement and seek the return of their deposit if the defendant did not agree to satisfy their conditions.

In an e-mail sent on February 14, 2011, Mannarino responded to each one of the plaintiffs' demands. In response to the plaintiffs' first demand, Mannarino stated that he had consulted with the defendant's structural engineer and confirmed that the floor joist system exceeded all of the requirements of the South Windsor Building Code. As to the plaintiffs' second demand, Mannarino explained that the defendant had installed the waterproofing product on the exterior walls. As to the plaintiffs' third demand, Mannarino explained that the waterproofing had passed inspection as required by the South Windsor Building Department and that he would not hire an outside source to verify their inspection. As to the plaintiffs' fourth demand, Mannarino explained that the defendant's structural engineer had confirmed that the basement walls were "wet due to the pouring of the basement floor [during the winter and] the wet propane heat . . . ." In responding to the plaintiffs' fifth demand, that is, their request for an additional warranty, Mannarino explained that the waterproofing product came with "a ten year warranty

and all other state warranties will apply." Mannarino suggested that the plaintiffs hire a structural engineer and/or legal counsel to verify these findings, as the defendant could not meet their demands, but could "provide documentation that verifies the basement and floor system [were] built correctly."

On February 17, 2011, Attorney Doris B. D'Ambrosio, the plaintiffs' counsel, wrote to Attorney Gerald W. Brady, the defendant's counsel, explaining that the plaintiffs would not be closing on March 7, 2011, because the plaintiffs needed additional time to retain an expert to verify the statements made by Mannarino.[2] D'Ambrosio's e-mail further stated that the plaintiffs would not be closing on the house until "they are satisfied that those conditions have been satisfactorily rectified."

On March 3, 2011, Brady replied to the plaintiffs' counsel and stated that the plaintiffs were in breach of the purchase agreement, and that unless the plaintiffs made final selections to the house prior to closing, the defendant would place the house on the market. The final selections the plaintiffs were requested to make in preparation of closing included selecting (1) the kitchen countertops, (2) the bathroom countertop, (3) the light fixtures, (4) the fireplace design finish, (5) the bathroom vanity, (6) the closet shelving and (7) the brick walkway selections.

On April 13, 2011, Attorney James H. Howard, the defendant's new counsel, sent a letter that provided the plaintiffs the option to buy the house if they made "the necessary selections by the close of business Friday (April 15th)" and the closing date would be "on or before May 6." The plaintiffs neither responded to Howard's letter nor did they make the necessary finishing selections requested by the defendant.

Nearly two months later, on June 9, 2011, Howard and D'Ambrosio began a course of communications with the plaintiffs' offering to buy the house "as is." Howard responded by requesting that the plaintiffs make a "very specific proposal" setting forth the closing date, purchase price and conditions. On June 15, 2011, D'Ambrosio e-mailed Howard not with a "very specific proposal" of the plaintiffs offer, but rather, stating in general terms that "[i]t is urgent we complete this matter as soon as possible . . . my clients are interested in enforcing the contract." In response, Howard, for a second time, requested a "very specific proposal" of the closing date, purchase price and the conditions of the plaintiffs' offer. The plaintiffs failed to respond to this second request.

On June 28, 2011, however, D'Ambrosio corresponded with Howard asking him why she had not heard anything regarding the sale of the house. On July 1, 2011, Howard responded stating that because the plaintiffs

"were not ready willing and able to buy the house, the defendant has decided to sell the house to another buyer."

Based on the preceding findings of fact, the court concluded that "the plaintiffs failed to demonstrate by a preponderance of the evidence that they performed the contract or that the defendant breached the contract." Accordingly, the court found that the additional conditions the plaintiffs demanded in February and March, 2011, "went well beyond the requirements of the contract." Therefore, by the time the plaintiffs offered to purchase the house "as is," in June, 2011, the court determined that they had breached the purchase agreement and the defendant had no obligation to accept the offer.

The court further determined that because "the plaintiffs have failed to prove a breach of contract, their CUTPA claim set forth in count two necessarily also fail[ed] . . . [and] that there [was] utterly no evidentiary basis for a CUTPA claim." As for the counterclaim, the court found that the defendant failed to prove its claim of tortious interference "with prospective economic gain" by the preponderance of the evidence.[3] This appeal followed. Additional facts will be set forth as necessary.

On appeal, the plaintiffs claim that the court's factual findings underlying its conclusions that (1) the plaintiffs had breached the purchase agreement and (2) the defendant had not breached were clearly erroneous. Thus, they argue, the court's conclusions were improper. We disagree.

At the outset, we set forth the relevant standard of review that guides our analysis. A finding of breach of contract is subject to the clearly erroneous standard of review. *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 146 Conn. App. 169, 180, 78 A.3d 167 (2013), rev'd in part on other grounds, 322 Conn. 541,     A.3d     (2016). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id. "The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witness." (Internal quotation marks omitted.) *Carroll* v. *Perugini*, 83 Conn. App. 336, 339, 848 A.2d 1262 (2004). Moreover, when the factual basis of the trial court is challenged, this court reviews the record to determine "whether the facts set out in the memorandum of decision are supported by the evidence . . . in the whole record

. . . ." (Internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 157 Conn. App. 139, 181, 117 A.3d 876, certs. denied, 318 Conn. 902, 123 A.3d 882 (2015).

We now set forth the applicable law for breach of contract. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Treglia* v. *Santa Fuel, Inc.*, 148 Conn. App. 39, 45, 83 A.3d 1222 (2014). In our case law, "even a mere statement indicating unwillingness to perform a contractual duty owed to another may constitute a total breach of contract." *Carroll* v. *Perugini*, supra, 83 Conn. App. 341. Once a party repudiates a contract, the nonbreaching party is excused from its obligations under the contract. *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, supra, 157 Conn. App. 161.

We are guided further by a case both factually and legally analogous to the present case. As in the present case, the plaintiff and defendant in *Carroll* v. *Perugini*, supra, 83 Conn. App. 338, entered into an agreement for the construction of a house. In *Carroll*, however, the contract stated that the defendant was not responsible for any delays that were beyond his control. During the course of the construction process, due to an architect's design errors in the placement of the water heater, heating, ventilation and air conditioning units, the certificate of occupancy was denied and "[a]s a result, major revisions were necessary before the certificate of occupancy could be issued." Id., 339. The plaintiff refused to pay the defendant for the necessary "corrective work caused by the architect's errors," which led to a dispute between the parties concerning who breached the contract. Id., 340. The trial court found that "the plaintiff breached the contract by failing and refusing to pay the defendant for work necessary to revise and complete the project as a result of the architect's errors." Id., 339. On appeal, this court concluded that there was evidence to support the trial court's finding "that the plaintiff was in breach due to his refusal to pay the defendant to complete the job" and that the defendant was not in breach. Id., 341. Therefore this court held that the trial court's factual findings were not clearly erroneous. Id.

With the foregoing principles in mind, we turn to the specific claims on appeal in the present case. Preliminarily, the plaintiffs contend that it was not clear why the court found them in breach of the purchase agreement. The plaintiffs surmise that "[i]t can be assumed that Judge Peck has found them in breach of contract because they did not purchase the premises." The court's decision, however, sets forth the bases for its finding the plaintiffs in breach of the purchase agreement including its finding that the plaintiffs

demanded conditions prior to closing that went beyond the scope of the purchase agreement. Thus, we disagree that the reasons for the court's conclusion that the plaintiffs breached the purchase agreement are not clear. Further, we find support in the record for the court's factual findings and therefore are not persuaded that they are clearly erroneous.

I

The plaintiffs first claim that the court improperly concluded that they had breached the purchase agreement. Specifically, the plaintiffs make several challenges to the court's factual findings (1) as to whether the plaintiffs breached the purchase agreement and (2) that the plaintiffs told the defendant that they would not be purchasing the house.

The following additional facts are necessary for our determination that the court properly found that the plaintiffs breached the purchase agreement. On February 10, 2010, the plaintiffs sent an e-mail to the defendant demanding it meet their specific conditions.[4] In its memorandum of decision, the court noted that "[i]n their February 20,[5] 2011 e-mail to Mannarino, in no uncertain terms, the plaintiffs said: '[w]e will not be closing on the house until all of these conditions are met, if you were not going to be able to meet these conditions, we will terminate the contract and look for an immediate return of our deposits and any other payments that we have put into the house . . . .' " The court found that "those conditions went well beyond the requirements of the contract . . . ." The basis of the court's determination focused on the evidence of the plaintiffs' conduct presented at trial, including various e-mails, testimony and the requirements under the purchase agreement.

Pursuant to the purchase agreement, the defendant was obligated to "construct a single family residence in . . . good and workmanlike manner and in accordance with state and local codes and regulations" and the plaintiffs agreed to purchase the house at the agreed upon purchase price. The purchase agreement expressly stated that "[the defendant] makes no warranties under this [a]greement, except those required by law." The warranties required by law are set forth in the General Statutes §§ 47-117 and 47-118.[6]

After a thorough review of the record, we conclude that the evidence at trial supports the court's finding that the plaintiffs' demands in February and March, 2011, went beyond the scope of the purchase agreement. First, the additional ten year structural warranty demanded by the plaintiffs was not included in the purchase agreement. Next, as the defendant explained in its February 14, 2011 responsive e-mail, the waterproofing product came with a ten year warranty, the foundations, i.e., the waterproofing, had

passed inspection and that a certificate from the engineering team was beyond the terms of the purchase agreement. Mannarino further told the plaintiffs' structural engineer that he would "double up every other floor joist" to make the floor stiffer, even though he did not believe there to be a building code violation with the floor.

Accordingly, based on the evidence and testimony presented at trial, the plaintiffs were protected by the waterproofing product's ten year warranty and entitled to the express and implied warranties pursuant to §§ 47-117 and 47-118. In addition, as the plaintiffs indicated in their February 10, 2011 e-mail "[w]e will not be closing on the house until all of these conditions are met, if you were not going to be able to meet these conditions, we will terminate the contract . . . ." This demand for conditions that went beyond the scope of the purchase agreement constituted the breach at issue here.[7] For those reasons, the record supports the court's finding that the plaintiffs breached the purchase agreement by demanding that the defendant satisfy conditions that went beyond the scope of the purchase agreement.

Next we address the plaintiffs' challenge to the court's finding that they told the defendant that they would not purchase the house. We are not persuaded by the plaintiffs' contention. We conclude that there was evidence to support the court's finding. The February 10, 2011 e-mail, sent by the plaintiffs to Mannarino, the plaintiffs explicitly stated that they would "not be closing on the house until all of these conditions are met, if you were not going to be able to meet these conditions, we will terminate the contract . . . ." In addition, D'Ambrosio's February 17, 2011 e-mail stated that the plaintiffs would not be closing on the house until "they are satisfied that those conditions have been satisfactorily rectified." The conditions demanded in February and March, 2011, however, were not required under the purchase agreement. Thus, the defendant was not required to meet the plaintiffs' additional demands that went beyond the scope of the purchase agreement.

Both of the plaintiffs' e-mails established that they would not close on the house unless the defendant had satisfied their conditions. The record supports the court's finding that the plaintiffs stated that they would not purchase the house, therefore this finding was not clearly erroneous.[8]

## II

The plaintiffs next claim that the court improperly found that the defendant did not breach the purchase agreement. Specifically, the plaintiffs challenge the court's factual findings (1) that the plaintiffs' structural engineer admitted that the documents he requested were not necessary for residential construction, and

(2) that it was "unconvinced of the sincerity of" the plaintiffs' argument that the defendant had failed to tell them the water leak in the basement had been repaired. We disagree.

The following additional facts are necessary for our determination that the court properly found that the defendant did not breach the purchase agreement. In January, 2011, the plaintiffs communicated to the defendant their concerns regarding the quality of the floors and the basement. In response to an e-mail sent by the plaintiffs on February 10, 2011, Mannarino replied and explained that the defendant identified the issue regarding the water leak in the basement and stated how the issue would be rectified. Mannarino's e-mail further responded to the plaintiffs' additional concerns regarding the waterproofing, floors and warranties that came with the waterproofing product and identified the warranties provided by state and local laws.

At trial, however, Solairaj testified that he did not accept Mannarino's assurance that there was not a water issue in the basement.[9] As suggested by Mannarino, the plaintiffs decided to hire Robert J. Gambino, a structural engineer, to verify the defendant's reason as to why there was water in the basement and the quality of the floors. Gambino identified twenty-four items he believed needed further inspections in the house. Moreover, the plaintiffs further alleged that the defendant did not communicate with the plaintiffs that the repair to the leak in the basement was remedied. Therefore, the plaintiffs contend that the evidence at trial showed that the defendant was in breach of the purchase agreement for not initially providing them a house without a leak in the basement.

We now address the plaintiffs' challenge to the court's finding that Gambino "admitted and testified that the documents he was requesting from the [d]efendant were not necessary for residential construction and not required by town or state building codes." Specifically, the plaintiffs contend that the evidence at trial showed that Gambino testified that if the house had been built correctly, "then there is no reason [as to] why the [defendant] would not have access to such documents." After reviewing the record, we find support for the court's finding, and therefore, we are not persuaded by the plaintiffs' challenge.

As the record reveals, Gambino identified twenty-four items that he believed needed further inspection in the plaintiffs' house.[10] Gambino testified at trial that the list he provided to the plaintiffs in March, 2011, was based on his review of the purchase agreement, contract drawings and specifications. Gambino further testified that once the plaintiffs had provided Mannarino a copy of his letter, Mannarino called him expressing concern for the requested information because of the time, effort, and the costs associated

with putting it all together, and inquiring as to why Gambino needed all this information.

During the cross-examination, however, Gambino conceded that approximately one-half of the items were not required for residential construction and the other items were only required at the discretion of the town building official.[11] Although Gambino explained that all the information he requested should have been readily available if the structure was designed correctly, he acknowledged that all inspections on the house had passed the requirements of the town in March, 2011, when he was conducting his review. Gambino further agreed that "despite all this information that [he] claim[ed was] required and was never done, a certificate of occupancy was issued on the property." Considering that Gambino explicitly stated that various information he requested was not required for residential construction and that the other items were discretionary, we find support for the court's finding. Therefore, the record reveals that the court's finding that "Gambino's extensive list of items that he would need to comply with his engagement with the plaintiffs included items, which by his own admission, are not necessary for residential construction," was supported by Gambino's testimony and thus not clearly erroneous.

Finally, we address the plaintiffs' challenge to the court's factual finding that the water leak in the basement was repaired by the defendant. Specifically, the plaintiffs contend that the evidence at trial showed "that the [d]efendant never told them that the water problem had been repaired . . . ." The court's memorandum of decision, however, states that it's "unconvinced of the [argument's] sincerity . . . ."

The basis of the court's finding was that Mannarino's e-mail on February 14, 2011, explicitly stated how the water leak in the basement would be addressed. Mannarino explained that the water leak was emerging from the front stoop and that the leak would be rectified by removing the water that collected in the stoop and sealing the holes with an injection grout that would prevent moisture from entering the basement. Mannarino further explained that the waterproofing product they were using on the house came with a ten year warranty.

The court also heard testimony, relating to the basement leak, from Mannarino and the chief building official for the town. In reviewing the testimony presented at trial, we are mindful that this court is limited in its review because "[w]e cannot retry the facts or pass on the credibility of the witness." (Internal quotation marks omitted.) *Carroll* v. *Perugini*, supra, 83 Conn. App. 339. As our case law has recognized, the "resolution of conflicting factual claims falls within the province of the trial court." (Internal quotation marks omitted.) Id.

At trial, Mannarino's testimony explained the process of how the defendant removed the water from the front stoop, which he also stated in his e-mail to the plaintiffs on February 14, 2011. Mannarino testified that "[w]e got the water out of the stoop which eventually would have a concrete cap on it and would not leak. I explained that to the customer . . . . I mentioned the product in one of the e-mails . . . and that stopped the leak instantly . . . ." Also, Mannarino testified that he "could not just immediately stop the leak. I wanted to make sure that all the water was out of the stoop . . . and there was no harm in the water leaking into [the] basement cause it wasn't a finished product yet." Furthermore, Mannarino testified that the waterproofing product was used on the exterior of the house and it came with a ten year warranty that the plaintiffs would receive at closing.

In addition, the testimony from Christopher Dougan, the chief building official for the town, established that the certificate of occupancy was issued on May 12, 2011. Dougan also testified that other inspections throughout the construction process of the house passed the requirements set by the town, including the waterproofing system and the underground drainage system.[12]

The evidence established that throughout the construction process of the house the defendant had satisfied the South Windsor Building Code for residential construction at the time the plaintiffs breached the purchase agreement. Because there is evidence to support the court's conclusion that the defendant did not breach the purchase agreement and because only that court resolves conflicting factual claims, we conclude that the court's findings of facts were not clearly erroneous. See *Carroll* v. *Perugini*, supra, 83 Conn. App. 339.

The judgment is affirmed.

In this opinion the other judges concurred.

* This appeal originally was argued before a panel of this court consisting of Chief Judge DiPentima and Judges Prescott and Pellegrino. Thereafter, Judge Prescott recused himself and did not participate in the consideration of the case. Judge Beach was added to the panel and has read the record and briefs, and listened to a recording of the oral argument prior to participating in this decision.

[1] At the time of dispute, the plaintiffs had paid the initial $2500 deposit at signing and the $56,800 additional deposit at the time of signing the final house plan. Therefore, the total deposit paid by the plaintiffs was $59,300.

[2] As the court's memorandum of decision highlights, March 7, 2011 was one day after the expected closing date stated in the purchase agreement.

[3] The defendant did not file a cross appeal challenging the court's finding on its tortious interference counterclaim.

[4] The conditions that the plaintiffs demanded from the defendant included (1) a detailed explanation on the cause of the floor vibrations and a resolution through engineering means, (2) waterproofing of the basement from the exterior of the house, (3) requiring the defendant to provide a certificate of inspection on the waterproofing of the basement walls, (4) a certificate from the engineering team certifying the waterproofing done from the exterior, and (5) an additional ten year warranty on the structure of the house at no additional cost and warranting that the defendant would remedy any issues within one month.

[5] We assume that the court's reference to the February 20, 2011 e-mail

was a scrivener's error and that the court was referencing the plaintiffs' e-mail dated February 10, 2011.

[6] General Statutes §§ 47-117 and 47-118, provided both express and implied warranties for newly constructed residential houses that terminate one year after delivery of the deed or taking possession.

[7] Similarly, on February 17, 2011, D'Ambrosio sent an e-mail to Brady further stating that the plaintiffs would not be closing on the house until "they are satisfied that those conditions have been satisfactorily rectified."

[8] The plaintiffs challenge other findings of facts as to events that occurred *after* the breach of the purchase agreement; we do not address them.

[9] Mannarino stated these reasons in his February 14, 2011 e-mail, which was in response to the conditions the plaintiffs demanded in their February 10, 2011 e-mail.

[10] Some of the items identified in Gambino's twenty-four itemed informational request included further information regarding the "Design Wind Speed . . . Design Wind Exposure Category . . . Design Wind Uplift Load . . . Design Roof Dead Load . . . Design Roof Live Load . . . Design Attic Dead Load . . . Design Attic Live Load . . . Design Floor Dead Loads . . . Design Floor Live Loads . . . Load-Bearing Dimensional Lumber Certificate of Inspection Issued by Lumber Grading or Inspection Agency . . . As-Built Drawing Defining Structure's Design 'Load-Path' Thru the Structure . . . As-Build Drawing & Details Defining Structure's 'Force-Resistant' System . . . Wall Bracing Location & As-Built Details All Braced Wall Locations From The Foundation Up To The Roof . . . Floor Hazards Classification Zone . . . Soil Characteristics . . . Design Soil Bearing Capacity . . . Footing & Foundation Wall Concrete Designs . . . Copy of Concrete Delivery Tickets Showing Conformance with Concrete Designs . . . Footing & Foundation Reinforcement Drawings . . . As-Built Foundation Drain Layout Plan & Details . . . As-Built Foundation Waterproofing System Design & Details . . . ."

[11] As to items one through thirteen, Gambino testified on cross-examination that "it's up to the town building official to decide whether he wants this information provided or not . . . ." As to item fifteen, Gambino stated that it "refers to flood hazard clarification zone." Pertaining to item eighteen, Gambino testified that it was "somewhat subjective . . . ." As to item nineteen, Gambino testified that it referred to the concrete delivery tickets which he conceded were not necessary, but "Mannarino said he [could] easily provide [them] . . . ." Gambino further testified that item "[t]wenty, again [was] subjective. [That] [t]wenty-one, [twenty-two, and twenty-three] . . . refer[ed] to as-built, which would be after the construction and therefore do not pertain . . . prior to construction."

[12] The inspection of the foundations passed on December 2, 2010, and the inspection of the framing passed on February 16, 2011. Importantly, in the comments section of the framing inspection sheet, the inspector verified that he rechecked the family room framing for a bounce, which passed. Also, in Dougan's testimony he stated that all elements of the waterproofing system and underground drainage system passed the requirements for the town's inspection on the foundation on December 2, 2010.

———————————————