******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# RICHARD R. PALKIMAS *v.* EDGAR QUILLI ET AL.
## (AC 48078)

Alvord, Suarez and Westbrook, Js.

*Syllabus*

The defendants, subcontractors and owners of a cabinet building business, appealed from the trial court's judgment for the plaintiff, a home construction contractor, for the defendants' breach of the parties' contract to build cabinets for three residential homes in accordance with the contract's terms. The defendants claim, inter alia, that the court erred in finding that the Uniform Commercial Code (UCC) (§ 42a-1-101 et seq.) did not apply to the parties' contract. *Held*:

The trial court correctly determined that the UCC did not govern the plaintiff's action, as the parties' contract was primarily a contract for services, namely, the construction and installation of cabinets, not goods, and that determination was supported by the parties' written agreement and their testimony at trial.

The trial court abused its discretion in holding a posttrial hearing in damages in response to the defendants' motion to reargue, as the court did not issue an order indicating that the issues of liability and damages would be bifurcated, any evidence pertaining to damages should have been presented at trial, and the court should not have taken additional evidence after it rendered judgment.

The trial court's calculation of its damages awards was improper, as one award was not supported by evidence in the record, a second damages award was legally erroneous because it was not based on the plaintiff's reasonable cost to complete the work, less the unpaid balance remaining on the contract, and the plaintiff failed to mitigate his damages by not having the project completed by another subcontractor in the several years since the contract was executed and the court failed to make any findings explaining what monetary value was attached to the plaintiff's failure to mitigate damages.

Argued December 2, 2025—officially released April 21, 2026

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Menon, J.*; judgment for the plaintiff; thereafter, the court granted the defendants' motion to reargue and sua sponte ordered an evidentiary hearing in damages; subsequently, the court, following a hearing in

damages, awarded certain damages to the plaintiff, and the defendants appealed to this court. *Reversed in part*; *further proceedings*.

*Steven R. Smart*, with whom, on the brief, was *Daniel S. Smart*, for the appellants (defendants).

*Lindy R. Urso*, for the appellee (plaintiff).

*Opinion*

SUAREZ, J. The defendants, Edgar Quilli and Pablo Pauta,[1] appeal from the judgment of the trial court, rendered after a court trial, in favor of the plaintiff, Richard R. Palkimas. On appeal, the defendants claim that the trial court (1) improperly found that the Uniform Commercial Code (UCC), General Statutes § 42a-1-101 et seq., did not apply to the parties' contract, (2) abused its discretion when it ordered a posttrial hearing in damages in response to the defendants' motion to reargue, and (3) improperly calculated its award of damages. We agree with the defendants' second and third claims. We therefore reverse the judgment of the trial court with respect to its award of damages and remand the case to the court with direction to recalculate its award of damages consistent with this opinion. The judgment otherwise is affirmed.

The following facts, as set forth in the court's memorandum of decision, and procedural history are relevant to the resolution of this appeal. In November, 2014, the parties entered into a contract for the sale and construction of cabinets for three homes. The plaintiff is a home construction contractor, and the defendants are subcontractors who owned and operated a cabinet shop where they had been engaged in the business of building custom-made cabinets for residential properties.

Pursuant to the contract, the defendants agreed to assemble, paint, and install custom-made cabinets, to hang interior doors, and to perform trim work in each

[1] We refer to Quilli and Pauta collectively as the defendants and individually by name when appropriate.

of three residential properties that the plaintiff was constructing. The contract price totaled $37,500, to be paid in three installments of $12,500 for the work completed at each home. The contract specifies that 50 percent of each $12,500 installment would be paid when the cabinets for each respective home were assembled and ready to be painted. The remaining 50 percent of each installment would be paid by the plaintiff upon completion of the painting and installation of the cabinets.

"The contract terms specified that the plaintiff would examine the work that was completed by the defendants and would need to approve the completed work prior to paying the defendants the initial 50 [percent] payment. After the contract was executed, the plaintiff made written changes to the contract and provided the defendants with a copy of the amended written contract.

"The defendants ceased work on the project after completing the first set of cabinets. The plaintiff has alleged that the work that was done on the first set of cabinets did not meet the requirements specified in the contract, that he repeatedly communicated this to the defendants, and that the defendants failed to remedy this while also continuously demanding payment. The defendants have alleged that they did complete all work on the first set of cabinets, that the work was adequate under the terms of the contract, that the plaintiff failed to pay them as required by the contract, and that this failure to pay them caused them to cease work on the remainder of the project."

On July 23, 2021, the plaintiff commenced the present action. In August, 2021, the plaintiff filed a one count complaint against the defendants, alleging breach of contract. The plaintiff alleged that the cabinets were not assembled according to the contract terms, and that the defendants refused to correct the errors in their work identified by the plaintiff. Specifically, the plaintiff alleged, inter alia, that **(1)** molding was missing from the range hood cabinet; **(2)** the range hood cabinet was improperly constructed, including having "screw heads

and plywood end-grain showing on the finished face of the cabinet" that would not be covered; **(3)** some cabinets did not have backs installed; **(4)** the fireplace cabinetry was not built according to plan; and **(5)** many of the drawers and doors were not properly installed. The defendants filed an answer and special defense on September 30, 2021, in which they denied the material allegations in the plaintiff's complaint and alleged, by way of special defense, that the plaintiff's claims were barred by the applicable statute of limitations. Thereafter, the court granted the defendants' request to amend their special defenses. In their amended special defenses filed on September 11, 2023, the defendants alleged that **(1)** the action was barred by the four year statute of limitations in General Statutes § 42a-2-725[2] because the contract was for the sale of goods under the UCC, and **(2)** should the UCC not apply, the plaintiff's claim is barred by the six year statute of limitations pursuant to General Statutes § 52-576.[3]

The court, *Menon, J.*, conducted a trial on September 26, 2023. The plaintiff presented testimony from himself and Quilli, and submitted various documentary exhibits. The plaintiff testified, inter alia, that he incurred between $8000 and $12,000 in out-of-pocket expenses for materials related to the project, and that, as a result of the defendants' breach, the plaintiff was not able to complete the project and was paying mortgages and taxes on the three properties, which he was not able to rent. At the close of the plaintiff's case, the defendants'

---

[2] General Statutes § 42a-2-725 provides in relevant part: "(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . ."

[3] General Statutes § 52-576 (a) provides: "No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues, except as provided in subsection (b) of this section."

Although the defendants' answer and special defenses referenced General Statutes § 52-577, the statute of limitations applicable to tort actions, it appears that this was a scrivener's error. We further note that it appears that the defendants did not argue at trial, or on appeal before this court, that the present action was untimely commenced under § 52-576.

counsel orally moved for a directed verdict, arguing that the plaintiff did not present any evidence of damages. The court denied the motion, stating that, "given that we have heard testimony from . . . the plaintiff that he had three homes that needed to be completed and that he had mortgages on them and that the homes were not able to be rented or sold . . . there [was] some evidence regarding damages. The exact amount may not have been specified as yet. But, based on that, I'm going to deny the motion for a directed verdict at this time." At the end of trial, the court directed the parties to file posttrial briefs and asked the plaintiff to "clarify what damages you are seeking and how you come up with that figure . . . ." After the close of evidence, the parties submitted post-trial briefs. In the plaintiff's posttrial brief, he argued that the court should award $28,740.68 in damages plus statutory interest, which he asserted "was "the total of [his] out-of-pocket costs and the loss in the form of one year of property taxes that he paid for a property for which he could get no valuable use, as a direct result of the [defendants'] breach." The plaintiff attached to his posttrial brief "Exhibit A," which was a copy of an outstanding tax bill from the city of Stamford. On January 9, 2024, the defendants filed a motion for permission to file an objection to the plaintiff's posttrial brief, arguing that, in his posttrial brief, the plaintiff improperly had requested that the court take judicial notice of the alleged tax bill, which had not been introduced into evidence during trial. The court granted the defendants' motion.

On April 26, 2024, the court issued a memorandum of decision in which it rendered judgment for the plaintiff. The court first noted that the plaintiff had submitted a tax bill in his posttrial brief that had not been admitted into evidence and that it would "disregard this exhibit from consideration." The court then concluded that the UCC did not apply to the parties' contract, determining that, "[b]ased on the plain language of the contract, it is clear that the predominant purpose of the contract is the construction and installation of custom-made cabinets based on the specifications listed in the contract. . . .

As such, the contract in this case is a service contract and is therefore governed by the common law of contracts and not by the [UCC]. Consequently, the statute of limitations listed in article 2 of the [UCC] does not apply and the plaintiff's claim is not time barred." With respect to the plaintiff's breach of contract claim, the court determined, on the basis of the evidence presented, that the defendants failed to meet the workmanship quality requirements specified in the contract, which the court concluded was a condition precedent to the plaintiff's obligation to pay the defendants under the contract. Accordingly, the court concluded that the plaintiff established a breach of contract by the defendants. With respect to damages, the court stated: "Judgment may enter for the plaintiff in the amount of $28,740.68 plus statutory interest." The court did not articulate the basis for the sum that it awarded.

On May 15, 2024, the defendants filed a motion to reargue the court's decision. The defendants argued that the court's award of damages was not based on evidence in the trial record. Specifically, the defendants argued that the court's damages award in the amount of $28,740.68 plus statutory interest "appears to be based on two values argued in the plaintiff's brief, neither of which is based on evidence submitted at trial . . . ." The defendants noted that the first value "appears to originate from the plaintiff's [posttrial] brief, which argued that the plaintiff was damaged in 'out-of-pocket damages totaling approximately $14,500,'" and that the second value of damages was "seemingly based on evidence not submitted or before the court in the trial of the matter," namely, the property tax bill totaling $14,240.68. In response to the defendants' motion, the court, sua sponte, issued an order on May 16, 2024, stating, inter alia: "In light of the claims raised by the defendants regarding the court's determination of an award of damages, the court shall schedule an evidentiary hearing solely for the limited purpose of determining the amount of damages."

The defendants thereafter filed a motion for reconsideration of the court's May 16, 2024 order, arguing

that the court should not hold a posttrial evidentiary hearing in damages. The defendants asserted that holding a posttrial evidentiary hearing impermissibly would allow the plaintiff a second bite at the apple because the trial was not bifurcated between liability and damages, and there was no basis to hold a posttrial evidentiary hearing in damages. The defendants further asserted that the court should not have ordered that a posttrial evidentiary hearing take place sua sponte.

The court proceeded to hold a posttrial evidentiary hearing in damages over the defendants' objection on September 3, 2024. Before the hearing commenced, the court stated that, "in rendering its decision, the court did have a scrivener's error in the amount of damages that was listed. And, for that reason, the court did grant the motion for reargument that was filed by the defendant[s]." The defendants' counsel objected to the hearing taking place, stating: "I'd like to renew my objection to this hearing in general. The purpose of reargument is not to provide either party with a second bite of the apple, but it's to reargue on the record before the court originally, which was the trial that was held almost a year ago at this point." The court overruled the objection, stating that, "because there was an issue raised in the motion [to reargue] about the issue of damages, the court felt it would be most appropriate to give both parties an opportunity to address damages and so did treat this as a separate damages phase, having already determined liability." At the posttrial hearing, the court took additional testimony from the plaintiff and Quilli relating to the plaintiff's damages claim. Subsequently, the parties filed additional briefs on the issue of damages.

On September 12, 2024, the court issued an order in which it increased its damages award to $37,625. In its order, the court made additional findings based on the evidence presented at the hearing. The court, inter alia, found that the plaintiff had failed to mitigate his damages with respect to the first home because he had not completed the remaining 5 percent of the work on

that home "during the many years since the defendants breached the agreement" and that this failure to mitigate was not warranted. The court, however, did not make any findings as to the monetary value attendant to the plaintiff's failure to mitigate damages. The court noted that, in issuing its updated damages award, it relied on "evidence presented by the parties at the trial *and the hearing to address damages . . . .*" (Emphasis added.) The court calculated its updated damages award as follows: "Cost of work to be completed on the three homes: $25,625. Cost of materials: $12,000. Total damages: $37,625." This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendants' first claim is that the trial court incorrectly determined that article 2 of the UCC, General Statutes § 42a-2-101 et seq., did not apply to the parties' contract. Specifically, the defendants argue that the essence of the transaction between the parties was for the sale of goods and, therefore, the four year statute of limitations in § 42a-2-725 bars the plaintiff's action. We disagree.

The following additional facts are relevant to our resolution of this claim. The first section of the parties' contract, titled "Cabinet Description," provides that the defendants would "[*b*]*uild* all kitchen cabinetry, [two] bathroom vanities and [two] bathroom cabinets; second floor hallway cabinets; fireplace shelving/cabinets; library cabinets (see plans: *all woodwork, cabinetry and painting are included*)." (Emphasis added.) The parties later added to that section of the contract that the defendants would also perform "trim" work for each house.[4] The contract further provides that the project would require the defendants to "[b]uild, paint, and install all cabinets/moldings according to plans, [and][h]ang interior doors." The section of the contract

---

[4] The contract contains several handwritten addendums that, both parties testified, were added to the contract by the plaintiff as the defendants worked on the project.

titled "[m]aterials" specifically provides that "[a]ll wood/ materials [would be] supplied by [the plaintiff] [and] . . . [a]ll hardware [would be] supplied by [the plaintiff] . . . ." Paint was also to be supplied by the plaintiff under the contract. Moreover, under the "Terms & Conditions" section of the contract, the defendants were obligated to "construct and paint" all cabinets, with "[a]ll wood and paint supplied by the [plaintiff]."

At trial, Quilli testified that, under the contract, the plaintiff "agreed to provide [the defendants] with all materials; wood, plywood, cabinet materials, paint, hinges, and [the defendants] were then going to assemble the cabinets according to certain specifications." He further testified that the only items the plaintiff did not pay for besides the defendants' labor were "screws, sandpaper and finishing paint." Finally, Quilli testified that the contract price was based on the defendants' labor, not any materials that the defendants provided. The plaintiff similarly testified that he had agreed to "provide all material, three quarter inch plywood, half inch plywood, all prefinished plywood. Which means it's already been clear-coated and sanded. And then raw material, maple, screws, sandpaper, primer, paint, door slides, door hinges, trim, which I supplied all of."

"The court's application of the UCC to the facts and circumstances in a given case presents a mixed question of fact and law over which we exercise plenary review." *Northeast Builders Supply & Home Centers, LLC* v. *RMM Consulting, LLC*, 202 Conn. App. 315, 346–47, 245 A.3d 804, cert. denied, 336 Conn. 933, 248 A.3d 709 (2021). Further, "[o]ur analysis of the UCC involves questions of statutory interpretation over which our review is plenary. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that

meaning, [we first] consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citation omitted; internal quotation marks omitted.) *Seven Oaks Enterprises, L.P.* v. *Devito*, 185 Conn. App. 534, 545–46, 198 A.3d 88, cert. denied, 330 Conn. 953, 197 A.3d 893 (2018).

To the extent that the defendants' first claim requires us to interpret the parties' contract, we note that, "[a]lthough ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . . We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. Furthermore, [i]n giving meaning to the language of a contract, we presume that the parties did not intend to create an absurd result." (Citations omitted; internal quotation marks omitted.) Id., 542.

Article 2 of the UCC, General Statutes § 42a-2-101 et seq., applies to "transactions in goods." General Statutes § 42a-2-102 (a). General Statutes § 42a-2-106 provides that article 2 applies to those contracts "relating to the present or future sale of goods. . . ." "Goods" is defined in General Statutes § 42a-2-105 (1) as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid . . . ." Further, goods "must be both existing and identified before any

interest in them can pass. Goods which are not both exist-
ing and identified are 'future' goods. A purported present
sale of future goods or of any interest therein operates
as a contract to sell." General Statutes § 42a-2-205 (2).
"[T]he term goods is not to be given a narrow construc-
tion but instead should be viewed as being broad in scope
so as to carry out the underlying purpose of the [c]ode
of achieving uniformity in commercial transactions."
(Internal quotation marks omitted.) *Western Dermatol-
ogy Consultants, P.C.* v. *VitalWorks, Inc.*, 146 Conn. App.
169, 177, 78 A.3d 167 (2013) (*Western Dermatology*),
aff'd, 322 Conn. 541, 153 A.3d 574 (2016). The UCC's
provisions are generally not applicable, however, to ser-
vice contracts. See id., 176.

If a contract is a mixed or hybrid agreement that pro-
vides for both services and goods, courts look to deter-
mine whether the contract's predominant purpose is to
provide for the sale of goods, or, alternatively, whether
service predominates, and the sale of such items is inci-
dental.[5] Id., 178 ("[t]o determine whether a contract
including both goods and services is governed by the
[UCC], the court must determine whether the dominant
factor or essence of the transaction is the sale of the
materials or the services" (internal quotation marks omit-
ted)); see also, e.g., *Cacace* v. *Morcaldi*, 37 Conn. Supp.
735, 739–40, 435 A.2d 1035 (1981) (plaintiff's claims
were based on alleged breach of contract to perform
services in construction of chimney and not on breach
of contract for sale of goods under UCC, reasoning that
term "[g]oods" did not include services performed in
completing chimney intended to be permanently affixed

---

[5] In reviewing this determination, which presents a relatively novel
issue concerning the applicability of the UCC in Connecticut, we may
look to persuasive case law from other jurisdictions. See, e.g., *Stan-
dard Structural Steel Co.* v. *Debron Corp.*, 515 F. Supp. 803, 809 (D.
Conn. 1980) ("in deciding novel issues under [a]rticle 2 . . . Connecti-
cut [appellate courts] often [look] to well-reasoned opinions in other
jurisdictions"); *Western Dermatology Consultants, P.C.* v. *VitalWorks,
Inc.*, supra, 146 Conn. App. 176 (looking to persuasive jurisprudence in
determining whether software license was sale of goods under purview
of UCC, when case law concerning that issue was unclear).

to house). "Key factors in making this distinction include whether the subject of the agreement is declared to be goods and whether the defendant's compensation is based on the price of the goods sold or the provision of related services. . . . This inquiry depends heavily on the facts and terms peculiar to that contract." (Citations omitted; internal quotation marks omitted.) *Alessi Equipment, Inc.* v. *American Piledriving Equipment, Inc.*, 578 F. Supp. 3d 467, 492 (S.D.N.Y. 2022).

The determination of whether a contract is for the sale of goods or for services provided is generally considered to be a question of fact but, "[g]iven a sufficient factual record a [court] properly may determine as a matter of law whether an agreement falls under the UCC." (Internal quotation marks omitted.) *Larkin* v. *Saber Automotive, LLC*, 736 F. Supp. 3d 193, 200 (S.D.N.Y. 2024). It is "not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom). . . . The courts also consider it significant whether the parties' agreement specifies any allocation between the costs of materials and services and the relative costs of the goods to the total contract price." (Citations omitted; internal quotation marks omitted.) *John C. Grimberg Co.* v. *Nudura Corp.*, 775 F. Supp. 3d 946, 959–60 (D. Md. 2025).

In the present case, we agree with the court that the plaintiff's cause of action was essentially one for breach of a contract for services, namely, the construction and installation of the cabinets for each property. The court found that the predominant purpose of the contract was for the rendition of services, rather than the sale of goods.[6] First, as stated previously, the contract provides

[6] We note that the court did not expressly determine that the contract was a "mixed" or "hybrid" contract, but it applied the predominant purpose test to conclude that the contract was a services contract. We conclude that, assuming that the cabinets constituted "goods" under

that the defendants would "[b]uild, paint, and install all cabinets," and that all materials would be provided by the plaintiff. Second, the contract is titled "Cabinet Project," rather than a "purchase" or "sale." See, e.g., *Gulash* v. *Stylarama, Inc.*, 33 Conn. Supp. 108, 111, 364 A.2d 1221 (1975) (concluding that contract was for services and did not fall under UCC because agreement to sell and install swimming pool was not labeled as "sale," and materials were merely incidental to main purpose of agreement); *Epstein* v. *Giannattasio*, 25 Conn. Supp. 109, 113, 197 A.2d 342 (1963) (concluding that contract for beauty parlor services was services contract, and stating that "[b]uilding and construction transactions which include materials to be incorporated into the structure are not agreements of sale"); see also *In re Trailer & Plumbing Supplies*, 133 N.H. 432, 437, 578 A.2d 343 (1990) (services aspect of contract to install plumbing predominated when agreement was termed "project"). Third, the contract price was based on the defendants' labor in completing the project: the section of the contract concerning the price is titled "[t]otal *labor* cost of projects." (Emphasis added.) Fourth, the plaintiff's allegations in his complaint relate to the defendants' alleged defective services in assembling the cabinets, rather than to the goods themselves.[7] Cf., e.g., *KSW Mechanical Services* v. *Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 142 (E.D.N.Y. 2014) (contract fell under UCC because allegations in complaint did not mention services, and courts "may look to the face of the complaint when considering whether an agreement is subject to the UCC" (internal quotation marks omitted)).

Essentially, the contract describes the defendants' obligations as furnishing their labor in order to construct the cabinets, as well as the trim and hanging of interior doors. The materials that were provided by the plaintiff to the defendants to build the cabinets clearly

the UCC, the court correctly determined that the predominant purpose of the parties' contract was one for the rendition of services.

[7] For example, the plaintiff alleges that the defendants "refused to correct the obvious errors *in their work* . . . ."

were incidental to the defendants' labor in performing the contract. See, e.g., *Connie Beale, Inc.* v. *Plimpton*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-08-5008751-S (January 13, 2010) (49 Conn. L. Rptr. 200, 202) (agreement to perform interior decorating services did not constitute sale of goods, as predominant purpose of contract was for services, and noting that transaction that requires incorporation of materials does not make it agreement for sale, even if contract "necessarily incorporates the provision of some materials"); *Page* v. *Hotchkiss*, Superior Court, judicial district of Windham, Docket No. CV-02-0067814 (December 2, 2003) (36 Conn. L. Rptr. 193, 196) (finding that essence of transaction was for services when plaintiff purchased defendant's "work and labor," plaintiff "supplied [the defendant] with the material, a software program, he wanted customized, and the essential consideration of the transaction was [the defendant's] hourly labor," and concluding that "[t]his purchaser contracted for a service to be performed and *he carried away a tangible result of that service*" (emphasis added)). Further, as stated previously, even if the finished cabinets were considered "goods," the defendants' performance under the contract clearly was intended to be for the rendition of services, specifically, for their labor in constructing and installing the cabinets. See footnote 5 of this opinion.

*Western Dermatology Consultants, P.C.* v. *Vitalworks, Inc.*, supra, 146 Conn. App. 169, which is relied on by the defendants, is distinguishable. In that case, this court determined that the UCC applied to the parties' contract, which concerned the purchase of "software licenses, hardware, services and concomitant support." Id., 176. This court determined that the "support services to be provided by [the defendant] via the agreement were all related to and dependent upon the software and hardware purchased under the agreement. Without the sale of the software and hardware, i.e., the goods, there would have been no need for the concomitant support services. The essence of th[e] agreement, therefore, was

a 'transaction in goods' under § 42a-2-102 and, as such, the UCC governs th[e] agreement." Id., 178–79.

Unlike in *Western Dermatology*, however, the materials in the present case were provided by the plaintiff, not the defendants.[8] See id., 172–73. Moreover, the services that were rendered in *Western Dermatology* were "concomitant," or ancillary, to the hardware and software products that the defendants installed; id., 173; whereas, in the present case, the defendants' labor *was* their essential obligation under the contract. Accordingly, here, we conclude that "service predominates and the sale of [the] items is incidental." (Internal quotation marks omitted.) *Alessi Equipment, Inc.* v. *American Piledriving Equipment, Inc.*, supra, 578 F. Supp. 3d 492. Rather than the defendants merely constructing the cabinets without any input from the plaintiff, the parties worked together to construct the custom cabinets to the plaintiff's specifications, which is reflected in the contract language, the handwritten addendums thereto,[9] and the parties' testimony concerning their

---

[8] For the same reason, we conclude that *Charter Oak Fire Ins. Co.* v. *Yeadon Fabric Domes, LLC,* 783 F. Supp. 3d 696, 714 (N.D.N.Y. 2024) (*Charter Oak*), is also distinguishable. That case concerned a contract to provide a recreational air supported sports dome for a college. Id., 703. As in *Western Dermatology*, in *Charter Oak*, the defendant contractor provided all materials that made up the dome, including the dome itself and, inter alia, inflation units with furnaces, a remote access thermostat, and a snow sensor. Id., 704–705. The court in *Charter Oak* first determined that the dome was movable at the time of identification of the contract and, second, concluded that the primary objective of the contract was to supply the dome, not to render services relating to it. Id., 716. Here, by contrast, the plain language of the parties' contract provides that the defendants' services were the primary focus of their obligations, namely, to construct and install the cabinets per the plaintiff's specifications, as well as to perform trim work and to hang interior doors in each property.

[9] For example, under "Project Details," the contract provides specific requirements regarding the workmanship of the cabinets and further provides that, for the defendants to receive the initial 50 percent deposit payment for each property, the plaintiff's satisfaction with the defendants' construction of the cabinets was required.

course of performance.[10] See also, e.g., *Incomm, Inc.* v. *Thermo-Spa, Inc.*, 41 Conn. Supp. 566, 570, 595 A.2d 954 (1991) (concluding that contract for production of brochure did not fall under UCC because "[t]he 'essence' of what was being purchased . . . was work, labor and services rather than materials" and parties would closely work together in producing brochure). Notably, the parties' agreement encompassed more than the construction of the custom cabinets; here, the defendants also agreed to install the cabinets, to hang interior doors, and to perform trim work in each house. Therefore, we conclude that the court correctly determined that the contract was primarily one for services, not goods, and that determination was supported by the parties' written agreement and their testimony at trial.[11] Accordingly, the UCC does not govern the plaintiff's action, and we reject the defendants' first claim.

## II

The defendants' second claim is that the court abused its discretion when it conducted a posttrial hearing in damages in response to their motion for reargument. The plaintiff's counsel conceded at oral argument before this court that the trial court abused its discretion by ordering a posttrial hearing in damages. We view this concession as having effectively waived any and all arguments concerning the court's decision to proceed with a posttrial hearing in damages. We agree that the court abused its discretion in holding a posttrial hearing in damages in response to the defendants' motion to reargue

---

[10] Quilli, for example, testified at trial that, "every time [the plaintiff] wanted something new added to the contract . . . [h]e would ask us if we could do this, and we would agree to it."

[11] Although not binding on this court, we note that the Vermont Supreme Court, in a case addressing a hybrid contract for goods and services, similarly concluded that the contract was not subject to the UCC. Cf., e.g., *Openaire, Inc.* v. *L.K. Rossi Corp.*, 182 Vt. 636, 637, 940 A.2d 724 (2007) (contract was not subject to UCC when it included more than simply production of components of retractable swimming pool enclosure, which was specially manufactured good, but also required subcontractor to deliver components and construct new, independent structure on jobsite).

and, therefore, we reverse the court's judgment with respect to this claim.

We begin with the standard of review and relevant legal principles. "[I]n reviewing a court's ruling on a motion to open, reargue, vacate or reconsider, we ask only whether the court acted unreasonably or in clear abuse of its discretion. . . . When reviewing a decision for an abuse of discretion, every reasonable presumption should be given in favor of its correctness. . . . As with any discretionary action of the trial court . . . the ultimate [question for appellate review] is whether the trial court could have reasonably concluded as it did. . . . [T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . It also may be used to address . . . claims of law that the [movant] claimed were not addressed by the court. . . . [A] motion to reargue [however] is not to be used as an opportunity to have a second bite of the apple . . . ." (Internal quotation marks omitted.) *Loch View, LLC* v. *Windham*, 237 Conn. App. 462, 504–505,    A.3d    (2026).

In *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 249, 919 A.2d 421 (2007), our Supreme Court concluded that the trial court improperly allowed the plaintiff to prove its damages at a posttrial hearing in damages. The court stated: "When neither party has reason to believe that the trial has been bifurcated . . . the only function of a posttrial damages hearing would be to allow the party claiming damages a second bite at the apple." Id., 253. The court further reasoned that neither party reasonably anticipated that there would be a separate damages hearing, and the trial court did not indicate that the issue of damages would be tried in a separate proceeding. Id., 253–54; see also, e.g., *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, 218 Conn. 474, 476–78, 590 A.2d 431 (1991) (concluding that this court incorrectly ordered remand of case for retrial on issue of

damages when plaintiff sought injunctive relief and did not produce evidence of damages at trial).

In the present case, the court did not issue an order indicating that the issues of liability and damages would be bifurcated. See, e.g., *Carrillo* v. *Goldberg*, 141 Conn. App. 299, 313–14, 61 A.3d 1164 (2013) (court properly denied plaintiffs' motion for hearing on punitive damages because plaintiffs "cite[d] no evidence in the record . . . that indicates that either party requested or expected that the trial would be bifurcated with a posttrial damages hearing," and, therefore, court had no authority to grant plaintiffs' motion). Neither party filed a motion to open the evidence, which the court effectively ordered sua sponte. The plaintiff did not argue before the trial court, for example, that he did not have adequate time, through discovery or otherwise, to develop his damages claim or that he was otherwise prevented from obtaining and presenting evidence at trial. Cf., e.g., *Weiss* v. *Smulders*, 313 Conn. 227, 261–62, 96 A.3d 1175 (2014) (court did not abuse its discretion in granting defendants' motion to reargue and reversing its sua sponte decision to hold posttrial evidentiary hearing in damages when plaintiffs had ample pretrial opportunity to obtain evidence pertaining to damages). For these reasons, the court should not have proceeded to a posttrial hearing in damages.

Although the court stated at the September 3, 2024 hearing that its reasoning for granting the defendants' motion to reargue its damages award was that it had made a "scrivener's error," the court did not explain the basis of this alleged error.[12] Although trial courts are vested with discretion to permit reopening of the evidence when "mere inadvertence *or some other compelling circumstances* . . . justifies a reopening and no substantial prejudice will occur," in this case, the court did not

_____

[12] Indeed, if the court determined that it had made a scrivener's error, it could have granted the motion to reargue and issued a corrected memorandum of decision. See, e.g., *Milazzo* v. *Schwartz*, 88 Conn. App. 592, 596, 871 A.2d 1040 (2005) (clerical errors may be corrected at any time).

articulate, and the record does not reveal, that any such circumstance existed. **(Emphasis added.)** *State* v. *Freeman*, 132 Conn. App. 438, 446–47, 33 A.3d 256 (2011), aff'd, 310 Conn. 370, 77 A.3d 745 (2013). Moreover, cases such as *Freeman* are distinguishable because they address a court's decision to reopen the evidence before judgment is rendered, whereas, in the present case, the court reopened the evidence after it rendered judgment. See *Fountain Pointe, LLC* v. *Calpitano*, 144 Conn. App. 624, 641, 76 A.3d 636 ("[i]n the ordinary situation where a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time *before the case has been decided*" **(emphasis added; internal quotation marks omitted)),** cert. denied, 310 Conn. 928, 78 A.3d 147 (2013). Thus, the court's posttrial hearing in damages effectively "reopen[ed] the trial record and [admitted] new evidence [that] the [p]laintiff could have offered during the trial but did not." **(Internal quotation marks omitted.)** *Manzo-Ill* v. *Schoonmaker*, 188 Conn. App. 343, 363, 204 A.3d 1207, cert. denied, 331 Conn. 925, 207 A.3d 27 (2019); see also, e.g., *Lynch* v. *Lynch*, 153 Conn. App. 208, 244–45, 100 A.3d 968 (2014) **(trial court did not abuse its discretion in denying motion to reargue when movant did not ask court to consider overlooked legal authority or claim or to reconsider misapprehended fact but, instead, sought reevaluation of facts),** cert. denied, 315 Conn. 923, 108 A.3d 1124, cert. denied, 577 U.S. 839, 136 S. Ct. 68, 193 L. Ed. 2d 66 (2015).

Moreover, the plaintiff's counsel conceded at oral argument before this court that the trial court should not have taken additional evidence at a posttrial hearing in damages and should have relied on only the evidence originally submitted at trial to determine damages. "Concessions made during oral argument may be properly considered by the appellate courts in rendering their decision." **(Internal quotation marks omitted.)** *In re David*

*P.*, 154 Conn. App. 508, 516, 105 A.3d 960 (2014), cert. denied, 315 Conn. 922, 107 A.3d 959 (2015). Although the plaintiff asserts that any error was harmless because the court's second damages award was based on evidence in the record, we do not agree because the court's September 12, 2024 order states explicitly that it was issuing its $37,625 award on the basis of "the evidence presented by the parties at the trial *and* the hearing to address damages . . . ." (Emphasis added.) We further conclude, in part III of this opinion, that the court's September 12, 2024 damages award was also erroneous.

We agree with the parties that, because the trial was not bifurcated as to the issues of liability and damages, any evidence pertaining to damages should have been presented at trial, and the court should not have taken additional evidence after it rendered judgment in the present case. Accordingly, on remand, the court, in recalculating damages consistent with this opinion; see part III of this opinion; should consider only evidence, if any, that was submitted at the original trial.

### III

The defendants' final claim is that the court improperly calculated its damages awards.[13] Specifically, the defendants assert that the court abused its discretion when it awarded damages because the plaintiff did not demonstrate his damages to a reasonable certainty at trial or at the posttrial hearing in damages, and that the trial court improperly awarded damages on the basis of the outstanding contract price. We agree that the court improperly calculated its damages awards.

"Although the calculation of the amount of damages is a factual determination, the formula used in making that calculation is a question of law. . . . Thus, [w]e accord plenary review to the [trial] court's legal basis for its

[13] Although our resolution of the defendants' second claim is dispositive of this appeal, we also address the defendants' third claim because it is likely to arise on remand. See, e.g., *Budlong & Budlong, LLC* v. *Zakko*, 213 Conn. App. 697, 714 n.14, 278 A.3d 1122 (2022).

damages award. . . . *Ray Weiner, LLC* v. *Connery*, 146 Conn. App. 1, 7, 75 A.3d 771 (2013) (It is well settled that [t]he trial court has broad discretion in determining damages . . . . When, however, a damages award is challenged on the basis of a question of law, our review is plenary. . . .).

"As a general rule, in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place [him] in the same position [he] would have been in had the contract been properly performed . . . . Such damages are measured as of the date of the breach. . . . For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste. . . .

"Guarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach. . . . The concept of actual loss accounts for the possibility that the breach itself may result in a saving of some cost that the injured party would have incurred if he had had to perform. . . . In such circumstances, the amount of the cost saved will be credited in favor of the wrongdoer . . . that is, subtracted from the loss . . . caused by the breach in calculating [the injured party's] damages. . . . It is on this ground that . . . when an owner receives a defective or incomplete building, any part of the price that is as yet unpaid is deducted from the cost of completion that is awarded to him . . . . Otherwise, the owner would be placed in a better position than full performance would have put him, thereby doubly compensating him for the injury occasioned by the breach." (Citations omitted;

internal quotation marks omitted.) *Vilwell Builders I, LLC* v. *Pereira*, 237 Conn. App. 45, 60, 349 A.3d 590 (2026); see also 11 J. Perillo, Corbin on Contracts (2005) § 60.1, pp. 606–608 ("For a breach by defective construction, whether it is partial or total, and for a total breach by refusal and failure to complete the work, the injured party can usually get a judgment for damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste . . . . This measure of damages applies *even if the owner does not complete or repair the structure.*" (Emphasis added; footnotes omitted.))

In the present case, the court awarded damages totaling $28,740.68 in its April 26, 2024 memorandum of decision, but it did not explain how it arrived at this award or what evidence it relied on in reaching that amount. This figure is the exact amount that the plaintiff requested to be awarded as damages in his posttrial brief. The plaintiff, however, submitted additional evidence in his posttrial brief, namely, a tax bill, that was not in the trial record, and asserted therein that he had incurred $14,500 in out-of-pocket expenses for cabinet materials, even though, at trial, the plaintiff testified that his out-of-pocket expenses were between $8000 and $12,000. We therefore conclude that this award is erroneous because it is not supported by evidence in the record.

We also conclude that the court's September 12, 2024 damages award was legally erroneous. The court articulated its second damages award as follows: "Cost of work to be completed on the three homes: $25,625. Cost of Materials: $12,000. Total Damages: $37,625." First, the court based its September 12, 2024 award on evidence that was submitted at trial and at the posttrial hearing in damages, which we previously concluded was improper. See part II of this opinion. Second, the court's award of $25,625 represented the outstanding contract price. We conclude that the award of $25,625 was legally erroneous because it was not based on the

plaintiff's reasonable cost to complete the work, less the unpaid balance remaining on the contract. See, e.g., *Hees* v. *Burke Construction, Inc.*, 290 Conn. 1, 8–9, 961 A.2d 373 (2009) (concluding that attorney trial referee should have calculated damages in construction contract case by determining plaintiffs' reasonable cost to complete or repair work, less unpaid balance on contract). The plaintiff offers no authority for the proposition that the outstanding contract price, which is the amount the *defendants* would have received had the contract been fully performed, is an appropriate measure of damages in a breach of construction contract action by a contractor against a subcontractor.[14] Finally, the court also found that the plaintiff failed to mitigate his damages by not having the project completed by another subcontractor in the several years since this contract was executed, but failed to make any findings explaining what monetary value was attached to his failure to mitigate damages. See, e.g., *United Concrete Products, Inc.* v. *NJR Construction, LLC*, 207 Conn. App. 551, 567, 263 A.3d 823 (2021) ("We have often said in the contracts and torts contexts that the party receiving a damage award has a duty to make reasonable efforts to mitigate damages. . . . What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier." (Internal quotation marks omitted.)). Accordingly, we conclude that the court's damages awards were improper.[15]

The judgment is reversed only as to the trial court's calculation of damages and the case is remanded for further proceedings to recalculate the award of damages

[14] Although the plaintiff testified that, because of the defendants' breach, the property was "just sitting [there]" and the project therefore could not be completed because he had intended to rent out the properties, the plaintiff could have introduced evidence of a cost estimate in the form of expert testimony and/or reports as to the proposed cost of completion, which the court properly could have considered in determining damages.

[15] The defendants also assert that the court's September 12, 2024 award of $12,000 for out-of-pocket expenses was speculative because it was based only on the plaintiff's testimony, without any supporting

consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

documentation. The defendants therefore ask this court to direct the trial court to award the plaintiff only nominal damages.

The court, however, in its April 26, 2024 memorandum of decision, generally credited the plaintiff's testimony. See, e.g., *Bhatia* v. *Debek*, 287 Conn. 397, 419, 948 A.2d 1009 (2008) (trial court was entitled to credit plaintiff's testimony concerning compensatory damages). The defendants do not argue that the court could not, as a matter of law, award damages for out-of-pocket expenses that the plaintiff incurred before the defendants' breach. See *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 328, 514 A.2d 734 (1986) ("[w]e have no difficulty with the basic idea that a party injured by a breach of contract may under certain circumstances recover the cost of his reliance as part of his expectation interest"); cf. 3 Restatement (Second), Contracts § 349, p. 124 (1981) (damages based on reliance interest may be awarded as alternative to expectations interest for expenditures made in preparation for performance or in performance). We thus decline to direct an order of nominal damages and, instead, direct the court to recalculate its damages award on remand on the basis of the evidence presented at trial.